In re 604 COLUMBUS AVENUE
REALTY TRUST, Debtor.

CAPITOL BANK & TRUST
COMPANY, Appellee,

v.

604 COLUMBUS AVENUE REALTY
TRUST, Appellant.

In re 604 COLUMBUS AVENUE
REALTY TRUST, Debtor.

FEDERAL DEPOSIT INSURANCE COR-
PORATION, as Receiver/Liquidating
Agent of Capitol Bank & Trust Compa-
ny, Appellant,

v.

604 COLUMBUS AVENUE REALTY
TRUST, et al., Appellees.

Nos. 91–1976, 91–1977.

United States Court of Appeals,
First Circuit.

Argued March 5, 1992.

Decided June 19, 1992.

Robert Owen Resnick, with whom John F. Cullen, George J. Nader, and Cullen & Resnick, Boston, Mass., were on brief, for 604 Columbus Avenue.

Michael H. Krimminger, with whom Richard J. Osterman, Jr., Ann S. Duross, Washington, D.C., and Richard N. Gottlieb, Charleston, W.Va., were on brief, for F.D.I.C.

Before TORRUELLA, Circuit Judge, WEIS * and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

This is a case involving a failed loan transaction that well illustrates Polonius' advice, "[n]either a borrower, nor a lender be." [1] These appeals require us to determine, *inter alia*, the applicability of certain federal defenses available to the Federal Deposit Insurance Corporation (FDIC) in its capacity as receiver when it seeks to enforce against a bankrupt borrower an

---

* Of the Third Circuit, sitting by designation.

1. W. Shakespeare, Hamlet, act I, sc. iii at 75.

obligation formerly held by a failed financial institution.

## PROCEDURAL PATH

This case arises from the default by the 604 Columbus Avenue Realty Trust ("the Trust") on payment of a loan from the Capitol Bank and Trust Company ("the Bank"). Following the Trust's default, the Bank commenced mortgage foreclosure proceedings on the properties securing its loan, among which were the property owned by the Trust itself and properties of the Trust's principal beneficiary, Millicent C. Young ("Young").[2]

To forestall the foreclosures by the Bank, both the Trust and Young filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts. In May 1988, the Trust, with Young as co-plaintiff, initiated an adversary proceeding against the Bank, its principal secured creditor. In September 1990, the bankruptcy court awarded the plaintiffs approximately $140,000 in damages on claims of fraud and deceit, conversion, and breach of contract, plus interest and attorney's fees. The bankruptcy court found that the Bank improperly applied loan proceeds to payment of "soft costs" incurred by the Trust—financing fees, interest, taxes and similar expenses. It also found that an officer of the Bank extracted kickback payments from the loan proceeds in return for his assistance in securing approval of the loan. Under its power of equitable subordination pursuant to 11 U.S.C. § 510(c), the bankruptcy court subordinated the Bank's secured claim on the Trust's bankruptcy estate to the claims of the Trust's other creditors by an amount equal to the damages, plus interest and attorney's fees. It ordered the transfer from the Bank to the Trust of a security interest in the Trust's estate equivalent to the total of the damages, interest and attorney's fees.

During the pendency of an appeal of this judgment to the district court, the Bank was declared unsound by Massachusetts banking officials. The FDIC was appointed receiver, and in February 1991 was substituted as defendant-appellant in the district court.

In August 1991, the district court affirmed in substantial part the bankruptcy court's rulings on the merits of the Trust's claims and equitable subordination of part of the Bank's secured claim. It ruled, however, that the FDIC was entitled to raise the defenses available to it under the doctrine of estoppel established in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and 12 U.S.C. § 1823(e). Invoking the *D'Oench* doctrine, the district court vacated that part of the bankruptcy court's judgment that was premised on the secret agreement by one of the Trust's principals to provide kickbacks to a Bank officer.

Both the Trust and the FDIC appeal various aspects of the judgments of both the bankruptcy and district courts. We affirm the judgment of the bankruptcy court, as modified by the district court.

## BACKGROUND AND FACTS

Before stating the facts, we think it useful to review the dual role of the FDIC in bank failures. Our recent decision in *Timberland Design, Inc. v. First Service Bank For Savings*, 932 F.2d 46, 48 (1st Cir.1991), provides an excellent summary of the FDIC's different functions:

> As receiver, the FDIC manages the assets of the failed bank on behalf of the bank's creditors and shareholders. In its corporate capacity, the FDIC is responsible for insuring the failed bank's deposits. Although there are many options available to the FDIC when a bank fails, these options generally fall within two categories of approaches, either liquidation or purchase and assumption. The liquidation option is the easiest method,

---

**2.** The Bank also had a mortgage on a property owned by the Young Family Trust, of which Millicent Young was sole beneficiary. The Young Family Trust was a named plaintiff in the adversary proceeding in the bankruptcy and district courts below. For purposes of convenience, we refer to Young and the Young Family Trust collectively as "Young."

but carries with it two major disadvantages. First, the closing of the bank weakens confidence in the banking system. Second, there is often substantial delay in returning funds to depositors. The preferred option when a bank fails, therefore, is the purchase and assumption option. Under this arrangement, the FDIC, in its capacity as receiver, sells the bank's healthy assets to the purchasing bank in exchange for the purchasing bank's promise to pay the failed bank's depositors. In addition, as receiver, the FDIC sells the "bad" assets to itself acting in its corporate capacity. With the money it receives, the FDIC-receiver then pays the purchasing bank enough money to make up the difference between what it must pay out to the failed bank's depositors, and what the purchasing bank was willing to pay for the good assets that it purchased. The FDIC acting in its corporate capacity then tries to collect on the bad assets to minimize the loss to the insurance fund. Generally, the purchase and assumption must be executed in great haste, often overnight.

*Id.* at 48 (citations omitted).

Turning to the case at hand, we first summarize the extensive findings of fact of the bankruptcy court. *See In re 604 Columbus Avenue Realty Trust,* 119 B.R. 350 (Bankr.D.Mass.1990) ("Bankruptcy Court Opinion"). The loan transaction at issue in these appeals originated in the efforts of Young and several business associates to purchase two buildings located at 604–610 Columbus Avenue in Boston, Massachusetts ("the Columbus Avenue properties"), and a restaurant operated on the premises known as "Bob the Chef." Young was the owner of a contracting and construction company. Among her business partners was Carl Benjamin ("Benjamin"), who served as her financial adviser.

In October 1985, Young and Benjamin learned of the availability for purchase of the Columbus Avenue properties. Young and Benjamin, along with two other partners, agreed to enter into a business relationship through which they would purchase the Columbus Avenue properties, renovate and resell the properties as condominiums, resell the restaurant, and share the profits from the condominium sales and sale of the restaurant. In November 1985, Young and Benjamin offered the owner of the Columbus Avenue properties $1.2 million for the buildings and the restaurant.

Young's attorney, Steven Kunian ("Kunian"), suggested that she and her partners seek financing for the purchase and renovation of the Columbus Avenue properties from the Bank. Kunian had represented the Bank from time to time on loan transactions. In December 1985, Benjamin negotiated the terms of a loan from the Bank on behalf of Young and the other partners. The Bank was represented in these negotiations by a loan officer, Arthur Gauthier, and a member of the Bank's Board of Directors, Sidney Weiner ("Weiner"). Weiner also served on the Bank's Executive Committee, which was responsible for the approval of loans. Although not a salaried employee of the Bank, Weiner was paid director's and consultant's fees, and was regarded by Gauthier and other bank employees as having primary authority for negotiation of the loan to Young and her partners.

Loans larger than $25,000 required the approval of the Bank's Executive Committee. Gauthier presented the proposal for the loan for the Columbus Avenue properties three times before the Executive Committee approved it on January 15, 1986. Final approval by the Executive Committee was achieved when Young agreed to pledge her residence as additional collateral for the loan. Weiner was one of the Executive Committee members who voted to approve the loan.

Some time before the Executive Committee voted to approve the loan, Weiner told Benjamin that the loan would only be approved on the condition that Benjamin agree to pay Weiner personally for his assistance in securing the Bank's approval of the loan. In exchange for this kickback, Weiner helped the loan proposal reach the Executive Committee, voted to approve the loan, and influenced other Committee members to vote in favor of the loan. There

was no evidence that other members of the Executive Committee were aware of Weiner's kickback arrangement with Benjamin when they voted to approve the loan. The bankruptcy court found that $26,300 was paid to Weiner.

Attorney Kunian represented both the Bank and the borrowers at the closing on the loan on February 27, 1986. Kunian suggested that Young and her associates hold the Columbus Avenue properties through a realty trust. At the closing the 604 Columbus Avenue Realty Trust was created, with Young as its trustee. Young was given 62.5% of the beneficial interest in the trust, while each of her three partners, including Benjamin, was made a 12.5% beneficiary. To secure the loan from the Bank, Young executed on behalf of the Trust a "Commercial Real Estate Promissory Note," a "Loan and Security Agreement" ("L & SA"), an "Addendum to Loan & Security Agreement ("L & SA Addendum"), and a "Construction Loan Agreement" (referred to collectively as the "First Loan Agreement"). The Bank, in turn, agreed to lend the Trust $1,500,000.

The Bank used a standard-form L & SA, which contained the following provisions:

SECTION 6. BANK'S RIGHT TO SET–OFF

6.01 The Borrower agrees that any deposits or other sums at any time credited by or due from the Bank to the Borrower, or any obligor or guarantor of any liabilities of the Borrower in possession of the Bank, may at all times be held and treated as collateral for any liabilities of the Borrower or any such obligor or guarantor to the Bank. The Bank may apply or set-off such deposits or other sums against said liabilities at any time.

. . . .

SECTION 8. EXPENSES

8.01 The Borrower shall pay or reimburse the Bank on demand for all out-of-pocket expenses of every nature which the Bank may incur in connection with this Agreement and the preparation thereof, the making of any loan provided for therein, or the collection of the Borrower's indebtedness under this Agreement. . . . [T]he Bank, if it chooses, may debit such expenses to the Borrower's Loan Account or charge any of the Borrower's funds on deposit with the Bank.

The parties also executed an Addendum to this L & SA, which established the following schedule for the Bank's advancement of the proceeds of the loan to the Trust: $1,200,000 at the closing to pay for the Trust's acquisition of the Columbus Avenue properties and the restaurant; a further $200,000 for construction-related expenditures at the Columbus Avenue properties, but only upon itemized requisitions approved by the Trust, its architect, and the bank; and $100,000 for the "soft costs" incurred with respect to the loan. "Soft costs" covered the various non-construction costs of the renovation effort, and included closing fees, interest, taxes and insurance. To secure its promissory note, the Trust gave the Bank, *inter alia,* a mortgage on the Columbus Avenue properties and a conditional assignment of rents from the properties in favor of the bank. Young, in her individual capacity, also gave the Bank mortgages on her residence and two other properties owned or held on her behalf.

At the closing, the Bank disbursed approximately $1,250,000, of which nearly $1,200,000 was paid to the owners of the Columbus Avenue properties, and the remaining amount was paid to the Bank itself for the costs of the loan. The Bank also created a checking account through which it was to disburse the remaining amounts of the loan. A signature card was created for the account bearing the names of Young, Benjamin, and another partner of the Trust. Those listed on the signature card had access to loan proceeds upon their disbursement by the Bank. Young was apparently not aware that Benjamin's signature was on the card.

The bankruptcy court found that the Trust's ability to repay the loan on the Columbus Avenue properties hinged on several assumptions that Young and her partners understood or reasonably should have understood at the closing. One of these assumptions was that $100,000 for

soft costs anticipated in First Loan Agreement would not cover those costs completely and would have to be supplemented by funds of Young and her partners. Another assumption was that the Trust could generate the funds necessary to complete the condominium project by selling the restaurant.

The Bank advanced the remainder of the proceeds of the loan—approximately $250,000—within forty-seven days of the closing, in three large payment. Weiner personally directed Gauthier to pay these advances into the Trust's account, but did so without the approval of Young and in violation of the procedures specified in the First Loan agreement. The bankruptcy court found that the Bank paid itself a total of $102,305.54 out of loan proceeds to cover soft costs, thereby exceeding by $2,305.54 the amount of soft costs contemplated in the First Loan Agreement. The sum of $26,300 was withdrawn by Benjamin from the loan account without Young's knowledge or authorization, which was then used to make kickback payments to Weiner. Sometime thereafter, Young learned of Benjamin's conduct, and attempted unsuccessfully to expel him from the Trust and to get him to give up his beneficial interest in it.

When the six-month term of the First Loan Agreement expired in August 1986, the Trust could not repay the loan. It therefore negotiated a second six-month loan to refinance the first (the "Second Loan Agreement"). On September 12, 1986, the Trust signed a promissory note to the Bank for $1,750,000, which was secured by the same mortgages and guarantees as the First Loan Agreement. Young, on behalf of the Trust, executed a new L & SA that contained provisions identical to those in the L & SA accompanying the previous loan. In addition, the Addendum to the L & SA in the Second Loan Agreement provided, *inter alia*, the following scheme for disbursement:

> The Bank shall advance the loan proceeds approximately as follows: a. $1,500,000.00 at closing for acquisition of real estate and personal property[;] b. $190,000.00 for construction costs ... [;]

> c. $60,000.00 for soft costs incurred with respect to the loan.

At the closing of the Second Loan Agreement, $1,580,151.11 in loan proceeds were disbursed to pay the $1,524,516.11 balance remaining on the First Loan agreement and $55,635 in origination and attorney's fees for the new loan.

Four months later, in January 1987, the Trust sold the property at 610 Columbus Avenue for $692,400 and paid the Bank this amount in order to reduce the outstanding principal balance of the Second Loan Agreement. In March 1987, however, when the Second Loan Agreement came due, the Trust was unable to repay it. The Bank therefore entered into an "Agreement to Extend Mortgage and Note" with the Trust, in exchange for an extension fee.

The bankruptcy court found that during the term of the Second Loan Agreement and its extension, the Bank withdrew from the loan proceeds $169,406.12 for various soft costs, including closing fees, interest, charges for the loan extension, taxes, and attorney's fees. This amount exceeded the "approximately" $60,000 in soft costs originally provided for in the second L & SA Addendum by $109,406.12.

The Second Loan Agreement, as extended, came due on June 10, 1987. The Trust was unable to make payment. In September 1987, the Bank began foreclosure of the various mortgages it held as security for the loan. The bankruptcy court found that the reasons for the Trust's default included, *inter alia:* the inability of the Trust to sell the restaurant, and the attendant loss of cash needed to finance the condominium renovations originally planned; the further deprivation of cash needed for the project as a result of the kickback payments; and the Bank's overapplication of $109,406.12 in proceeds from the second loan to payment of soft costs. The bankruptcy court also concluded that it was the Trust's failure to sell the restaurant, rather than the Bank's overapplication of loan proceeds for soft costs and the kickback payments, that was by far the single most

important reason for the failure of the project.

## DECISIONS OF THE BANKRUPTCY AND DISTRICT COURTS

In bankruptcy court, the Trust and Young alleged that the Bank entered into and administered the loans for the improper purpose of extracting a kickback from loan proceeds. They also alleged that the Bank improperly applied proceeds from the two loans to the payment of soft costs. The plaintiffs alleged fraud and deceit, conversion, and breach of contract by the Bank. They also argued that the Bank's inequitable conduct warranted the subordination of the Bank's secured claim in the Trust's bankruptcy estate to those of all of the Trust's other creditors. In addition, the Trust and Young requested an order invalidating entirely the Bank's mortgages on their properties.

The bankruptcy court conducted a seven-day trial. It awarded the Trust $138,011.66 in damages. Of this amount, $26,300 was assessed as damages for the kickback payments made to Weiner by Benjamin. The kickback damages were based on claims of conversion, breach of contract and fraud under Massachusetts law. The remaining $111,711.66 in damages represented the total amount of soft costs that the bankruptcy court found to have been improperly removed from the loan proceeds by the Bank in violation of the limits set by the two loan agreements—i.e., $2,305.54 on the First Loan Agreement and $109,406.12 on the Second Loan Agreement. This award was premised on claims of conversion and breach of contract. The bankruptcy court also ordered that the $138,011.66 damages award be supplemented by an award of reasonable attorney's fees, which it found were warranted as an element of the conversion damages under Massachusetts law, and also of post-judgment interest at the contract rate specified in the loan agreements.

Invoking its powers of equitable subordination pursuant to 11 U.S.C. § 510(c), the court entered an order subordinating the Bank's secured claim to the claims of prior-ity and general unsecured claimants in an amount equal to the full amount of the damages, interest and attorney's fees. It further directed that the Bank transfer to the Trust's estate a portion of its security interest in an amount equal to the total damages. The bankruptcy court refused, however, to issue an order entirely invalidating the mortgages held by the Bank.

While the Bank's appeal of the bankruptcy court's judgment was pending, the FDIC was appointed receiver and liquidating agent of the Bank, and substituted for the Bank as defendant-appellant. The FDIC continued the Bank's appeal of the bankruptcy court's judgment as to the conversion, breach of contract, and fraud claims, as well as its challenge to the bankruptcy court's equitable subordination of its secured interest in an amount equal to the total damages. In addition, the FDIC raised two special federal defenses as to each aspect of the damages claims. The FDIC argued that the *D'Oench* doctrine— or its statutory counterpart, 12 U.S.C. § 1823(e)—precluded the bankruptcy court's award of damages on the kickback arrangement, insofar as this claim was based on a secret agreement between Weiner and Benjamin. The FDIC also argued that the special holder in due course status accorded it under federal common law entirely barred the Trust's claims for damages and equitable subordination against it in its receivership capacity.

The Trust and Young, on the other hand, challenged the applicability of the federal defenses urged by the FDIC, as well as the FDIC's right to raise these defenses for the first time on appeal. They also contested the bankruptcy court's refusal to grant them an order invalidating entirely the Bank's mortgages on their properties.

In August 1991, the district court affirmed the bankruptcy court's rulings on the merits of the plaintiffs' conversion and breach of contract claims with respect to the Bank's improper application of loan proceeds for payment of soft costs. Although the district court found that the FDIC was entitled to raise its federal defenses for the first time on appeal, it rejected the FDIC's argument that the federal

common law holder in due course doctrine barred the Trust's claims against it in its capacity as the Bank's receiver. The district court also affirmed the equitable subordination of the FDIC's secured claim on the Trust's estate in an amount equal to the damages on the soft costs claims, i.e., $111,711.66, plus post-judgment interest. It reversed, however, the bankruptcy court's inclusion of attorney's fees as part of the overall amount of the FDIC's claim subject to equitable subordination.

The district court vacated the bankruptcy court's award of $26,300 of damages based on the kickback arrangement between Benjamin and Weiner. Finding that the FDIC was entitled to raise the *D'Oench* doctrine for the first time on appeal, the court held that the kickback arrangement was a secret agreement squarely within the coverage of the doctrine. It therefore reduced the equitable subordination against the FDIC by an amount equal to the kickback damages. Because it found that the fraud claims based on the kickback arrangement could not stand against the FDIC, the court rejected the Trust and Young's arguments that it declare the loan agreements—and the mortgages on the plaintiffs' properties—void as illegal contracts in contravention of public policy.

## THE ISSUES ON APPEAL AND STANDARD OF REVIEW

In their appeals to this court,[3] both the FDIC and the Trust press substantially the same arguments made in their appeals of the bankruptcy court's judgment to the district court.[4] The FDIC argues that because it was the receiver of an insolvent bank, federal common law barred the plaintiffs' claims of conversion, breach of contract, and fraud, as well as the equitable subordination of the FDIC's secured interest in the Trust's estate. The FDIC maintains that any damages against it in its receivership capacity based on the soft costs claims were barred by the federal common law holder in due course doctrine,

and that the equitable subordination against it in an amount equal to those damages is contrary to federal common law. The FDIC also attacks the rulings of the bankruptcy court, affirmed by the district court, that the Bank misappropriated soft costs monies, as well as the equitable subordination of its secured claim to reflect the damages caused by the Bank's misappropriation. It further challenges the district court's affirmance of an award of post-judgment interest on the $111,711.66 in damages on the soft costs claims.

The Trust, on the other hand, argues that the district court erred by applying the *D'Oench* doctrine for the first time on appeal. The Trust insists that the *D'Oench* doctrine does not bar its recovery on its claims relating to the kickback scheme. The Trust also maintains that the district court erred when it held that the bankruptcy court incorrectly included attorney's fees as part of the overall amount of the FDIC's security interest subject to equitable subordination in favor of the Trust and other creditors.

In an appeal from a district court's review of a bankruptcy court's decision, we "independently review[ ] the bankruptcy court's decision, applying the clearly erroneous standard to findings of fact and de novo review to conclusions of law." *In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir. 1991). *See also In re Navigation Technology Corp.*, 880 F.2d 1491, 1493 (1st Cir. 1989) (bankruptcy court's determinations of law subject to de novo review); *Briden v. Foley*, 776 F.2d 379, 381 (1st Cir.1985) (clearly erroneous standard of review applied to bankruptcy court's factual findings).

## DISCUSSION

### I. DISTRICT COURT REVIEW OF THE FDIC'S FEDERAL DEFENSES FOR THE FIRST TIME ON APPEAL

Before considering the Trust's state law claims underlying its damages award

---

**3.** Following the district court's judgment, both the FDIC and the Trust docketed separate appeals with this court. The FDIC's appeal is No. 91–1977; the Trust's is No. 91–1976.

**4.** Young is not a party to the Trust's appeal. Neither the Trust nor Young has challenged the district court's affirmance of the bankruptcy court's refusal to void the mortgages on their properties.

against the Bank, we° first address the FDIC's arguments that two special defenses established under federal law—the federal common law holder in due course and *D'Oench* doctrines—barred all of the plaintiffs' claims and resulting equitable subordination against it as the Bank's receiver. In order to address the merits of these federal defenses, we must, as a threshold matter, determine whether the FDIC was entitled to raise them for the first time in the district court in its appeal of the bankruptcy court's judgment.

The district court based its decision to permit the FDIC to assert its federal defenses exclusively on the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (1989) (codified at 12 U.S.C. §§ 1811–1833e), which provides in pertinent part:

(13) Additional rights and duties

 (A) Prior final adjudication

 The Corporation shall abide by any final unappealable judgment of any court of competent jurisdiction which was rendered before the appointment of the Corporation as conservator or receiver.

 (B) Rights and Remedies of conservator or receiver

 In the event of any appealable judgment, the Corporation as conservator or receiver shall—

 (i) have all the rights and remedies available to the insured depository institution (before the appointment of such conservator or receiver) and the Corporation in its corporate capacity, including removal to Federal court and all appellate rights; and

 (ii) not be required to post any bond in order to pursue such remedies.

12 U.S.C.A. § 1821(d)(13)(A)–(B). The district court found that the bankruptcy court's judgment in favor of the Trust was "appealable" within the meaning of § 1821(d)(13)(B). It reasoned that the federal defenses against the Trust's claim asserted by the FDIC in its receivership capacity were among "the rights and remedies available to ... the [FDIC] in its corporate capacity." The district court concluded that the "rights and remedies" granted the FDIC in its receivership capacity included the right to raise its federal defenses for the first time on appeal. The district court based this analysis on its reading of FIRREA's text and legislative history.[5]

The district court acknowledged that this interpretation of § 1821(d)(13)(B) conflicted with that of the Fifth and Eleventh Circuits, both of which have rejected this interpretation of FIRREA. In *Olney Savings & Loan Association v. Trinity Banc Savings Association*, 885 F.2d 266 (5th Cir. 1989), the Fifth Circuit ruled that § 1821(d)(13)(B) did not in any way modify the substantive rights of the FSLIC in its receivership capacity, but merely assured the FSLIC standing to pursue all appeals previously available to it only in its corporate capacity. Accordingly, it held that FIRREA did not entitle the FSLIC to raise the *D'Oench* doctrine for the first time on appeal. *Id.* at 275. In *Baumann v. Savers Federal Savings & Loan Assoc.*, 934 F.2d 1506 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992), the Eleventh Circuit followed *Olney*, and rejected the argument of the Resolution Trust Corporation ("RTC") that § 1821(d)(13)(B) entitled it to raise the *D'Oench* doctrine. *Id.* at 1511. In *Baumann*, the Eleventh Circuit expressly re-

---

**5.** As evidence of Congress' special solicitude for the preservation of the rights of the FDIC in its receivership capacity, the district court emphasized FIRREA's provision of an automatic stay in any litigation to which the FDIC becomes a party. *See* 12 U.S.C. § 1821(d)(12). It also highlighted language in FIRREA's legislative history explaining the need for the automatic stay: "The appointment of a conservator or receiver can often change the character of the litigation; the stay gives the FDIC a chance to

analyze pending matters and decide how best to proceed." H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 331 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 127. The district court further relied on two decisions of the Texas Court of Appeals holding that § 1821(d)(13)(B) permits the FDIC to raise the *D'Oench* doctrine for the first time on appeal. *See FDIC/Manager Fund v. Larsen*, 793 S.W.2d 37 (Tex.Ct.App.), *writ granted*, 34 Tex. Sup.Ct.J. 91 (1990); *FSLIC v. T.F. Stone–Liberty Land Assocs.*, 787 S.W.2d 475 (Tex.Ct.App.1990).

jected the interpretation of § 1821(d)(13)(B) advanced by the district court in this case. The *Baumann* court concluded that to read the statute otherwise would be to grant a federal receiver new substantive rights, because neither FIRREA nor previously existing statutes granted the RTC in its corporate capacity the power to raise arguments for the first time on appeal. *Id.*

We think that the *Olney* and *Baumann* courts' interpretation of § 1821(d)(13)(B) is the proper one, and hold that the district court erred when it read FIRREA as allowing the FDIC in its receivership capacity to raise its federal defenses for the first time on appeal. We agree with the distinction drawn by *Baumann:* "the right at issue in this case is not the right of the [federal receiver] to argue [a federal defense], which is unquestioned, but rather the right of the [federal receiver] to raise an argument for the first time on appeal." *Id.* at 1512. Section 1821(d)(13)(B) merely accords the FDIC in its receivership capacity standing to raise the same defenses available to the FDIC in its corporate capacity. It does not establish that the FDIC as receiver is entitled to raise its federal defenses for the first time on appeal.

█ Although FIRREA does not grant the FDIC as receiver the right to raise its special federal defenses to the Trust's claims for the first time on appeal, we must also consider whether there is any alternative basis on which the district court could have permitted the FDIC to raise its federal defenses. The FDIC argues that even if § 1821(d)(13)(B) does not grant it the right to raise its federal defenses, the district court nonetheless had the discretion, in its capacity as an appellate court, to address these defenses for the first time on appeal.

The FDIC relies principally on *Baumann* for this argument. There, the Eleventh Circuit held that its discretion as an appellate court permitted it to address the federal receiver's *D'Oench* doctrine argument for the first time on appeal. *Id.* at 1513. The court stressed the fact that the RTC had not had the opportunity to present its argument in the trial court because it had not become a party to the suit until after

the entry of final judgment. *Id.* In order to prevent the RTC from being "penalized for not raising a defense it had no opportunity to present," the *Baumann* court concluded that it would be appropriate to exercise its discretion to exempt the RTC in its receivership capacity from its general rule precluding argument of issues for the first time of appeal. *Id.* The Fifth Circuit has also adopted *Baumann*'s approach in similar circumstances in which the federal conservator or receiver becomes a party to an appeal after the final judgment of the trial court. *See Resolution Trust Corp. v. McCrory*, 951 F.2d 68, 71 (5th Cir.1992) (citing *Baumann* and *Union Fed. Bank v. Minyard*, 919 F.2d 335, 336 (5th Cir.1990)).

█ It is the general rule in this circuit that arguments not raised in the trial court cannot be raised for the first time on appeal. *See, e.g., Boston Celtics Ltd. Partnership v. Shaw*, 908 F.2d 1041, 1045 (1st Cir.1990); *Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 359 (1st Cir.1989), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). Like other circuit courts of appeals, however, we have recognized that an appellate court has the discretion, in exceptional circumstances, to reach issues not raised below. *See United States v. La Guardia*, 902 F.2d 1010, 1013 (1st Cir.1990). In *United States v. Krynicki*, 689 F.2d 289, 291–92 (1st Cir.1982), we outlined the criteria for determining the appropriate exercise of our discretion to hear new issues. These criteria include, *inter alia*, whether the new issue is purely legal, such that the record pertinent to the issue can be developed no further; whether the party's claim appears meritorious; whether reaching the issue would promote judicial economy because the same issue is likely to be presented in other cases; and whether declining to reach the argument would result in a miscarriage of justice. *Id.*

The circumstances of this case were sufficiently exceptional to have permitted the district court to consider for the first time on appeal the merits of the federal defenses raised by the FDIC in its receivership capacity. The question of whether various federal defenses barred the Trust's claims

was purely legal and required no further development of the factual record; the FDIC's federal defenses were colorable, judged by the district court's acceptance of the FDIC's *D'Oench* argument to bar damages on the kickback claims; judicial economy would have been promoted by a ruling on the merits of the applicability of the FDIC's federal defenses, given the increasing volume of litigation involving federal receivers and/or conservators in this circuit; and finally, it would have been unfair to prevent the FDIC from raising its federal defenses when it had no such opportunity to assert them before the bankruptcy court. As *Baumann* and *McCrory* make clear, it is not uncommon for a federal receiver or conservator to become a party to a litigation after the final judgment of the trial court. To prevent the FDIC from raising its federal defenses in such circumstances would vitiate much of the purpose of allowing these defenses in the first place.

## II. THE *D'OENCH* DOCTRINE AS A BAR TO THE TRUST'S RECOVERY ON THE KICKBACK CLAIMS

We next review the question of whether the *D'Oench* doctrine, or its statutory counterpart, 12 U.S.C. § 1823(e),[6] bars the Trust's claims based on the kickback scheme and any equitable subordination against the FDIC as receiver.

In *D'Oench*, the Supreme Court held that in a suit brought by the FDIC to collect on a borrower's promissory note, in which the FDIC was the successor in interest to the original lender, the borrower was not entitled to rely on agreements outside the documents contained in the lender bank's

records to defeat the FDIC's claim. 315 U.S. at 460–61, 62 S.Ct. at 681. The Supreme Court announced a federal common law doctrine of equitable estoppel preventing the borrower from using a "secret agreement" with the original lender as a defense to the FDIC's demand for payment. *Id.* *D'Oench* did not require that the borrower have the intent to defraud: "The test is whether the note was designed to deceive creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority ... was or was likely to be misled." *Id.* at 460, 62 S.Ct. at 681.

 The contours of the *D'Oench* doctrine, which have expanded since the Court's original decision, are well-established in this circuit. *See Timberland Design*, 932 F.2d at 48–49; *FDIC v. Caporale*, 931 F.2d 1, 2 (1st Cir.1991); *FDIC v. P.L.M. Int'l, Inc.*, 834 F.2d 248, 252–53 (1st Cir. 1987). Although the *D'Oench* decision involved the FDIC in its corporate capacity, "courts have consistently applied the doctrine to those situations where the FDIC was acting in its capacity as receiver." *Timberland Design*, 932 F.2d at 49 (citing cases). We have also adopted the position of the great majority of the circuits that *D'Oench* "operates to bar affirmative claims as well as defenses which are premised upon secret agreements." *Id.* In addition, *D'Oench* applies to claims involving secret agreements that sound either in tort or in contract. *Id.* at 50 (citing *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987)). And finally, the fact

---

**6.** As amended by FIRREA, § 1823(e) provides: No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section ..., either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
 (1) is in writing,
 (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

 (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board committee, and
 (4) has been, continuously, from the time of its execution, an official record of the depository institution.
We treat § 1823(e) as the statutory codification of the *D'Oench* doctrine. *See Capizzi v. FDIC*, 937 F.2d 8, 9 (1st Cir.1991); *FDIC v. P.L.M. Int'l, Inc.*, 834 F.2d 248, 253 (1st Cir.1987).

that the FDIC may have actual knowledge of the secret agreement is irrelevant: "The proper focus under *D'Oench* is whether the agreement, at the time it was entered into, would tend to mislead the public authority." *Id.*

Applying the principles enunciated in *Timberland,* the district court held that *D'Oench* estopped the Trust from raising against the FDIC its affirmative claims based on the kickback scheme. It found that the record established that the Trust, through its agent Benjamin, had "lent itself" to a kickback scheme with the Bank. The district court concluded that the unwritten agreement and subsequent kickback payments between Weiner and Benjamin were a "secret agreement" squarely within the coverage of *D'Oench.*

The Trust contends that *D'Oench* should not have been applied for the district court for several reasons. It argues that its tort claims of conversion and fraud stand on a factual basis independent of the kickback arrangement, and that these claims therefore cannot be barred by *D'Oench.* For similar reasons the Trust argues that its breach of contract claim must also be upheld because the removal of $26,300 from the loan proceeds was a breach of the express terms of the written loan agreement, and not a breach of the unwritten kickback arrangement. In the alternative, the Trust invokes certain recognized exceptions to the *D'Oench* doctrine: it claims (1) that it is a non-negligent victim of "fraud in the factum," and (2), that the district court should have found that it was innocent of any intentional or negligent deception because Benjamin was not acting as

the Trust's agent at the time he removed loan proceeds for the kickback payments.

**A. The Scope of the Kickback Agreement**

■ We find little merit in the Trust's first argument, which counsel appears in part to have abandoned during oral argument.[7] As we understand it, the Trust's contention is that because its fraud and conversion claims are "not premised upon" the kickback arrangement, *D'Oench* cannot apply. According to the Trust, "the kickback arrangement merely explains why Capitol Bank chose to misappropriate the [Trust's] assets, whereas the misappropriations themselves are the basis of the [Trust's claims]." Brief for Appellant 604 Columbus Avenue Realty Trust at 27. The problem with the Trust's position is that the bankruptcy court's findings in respect to these claims, as well as its equitable subordination of $26,300 in lieu of damages, were in fact explicitly premised on the kickback arrangement. *See* Bankruptcy Court Opinion, 119 B.R. at 371 (conversion); *id.* at 374 (fraud); *id.* at 377 (equitable subordination). Nor does the Trust elaborate as to how other facts, independent of those relating to the kickback arrangement, provide an alternative basis for the bankruptcy court's findings in its favor.[8] The Trust's tort claims fall squarely under *D'Oench:* "*D'Oench* bars ... affirmative claims ... as long as those claims *arise out of an alleged secret arrangement.*" *Timberland,* 932 F.2d at 50 (emphasis added).

■ The Trust next argues that *D'Oench* does not bar its breach of con-

---

**7.** When pressed to explain why the *D'Oench* doctrine did not apply to all the Trust's claims relating to the secret agreement between Benjamin and Weiner, counsel for the Trust placed exclusive reliance on the argument that the Trust was an innocent party that had not knowingly made itself a party to the kickback arrangement with Weiner. Counsel stated that "if the Trust had in fact entered into an oral agreement, then you would be right; *D'Oench* would clearly apply. But the bankruptcy court did not find that fact. The bankruptcy court found that Benjamin was liable to the Trust for the twenty-six thousand dollars as well as the Bank.... [I]t seems to me to be a very, very broad appli-

cation of *D'Oench* where a borrower has not lent themselves [sic] in any fashion to this agreement."

**8.** The Trust's attempts to distinguish Weiner's conduct from the tortious conduct of the Bank are completely without merit. The Trust prevailed on its tort claims against the Bank in bankruptcy court on a respondeat superior theory, and cannot now evade the precepts of *D'Oench* by intimating that these tort claims against the Bank had nothing to do with the kickback arrangement masterminded by Weiner.

tract claim against the Bank for the $26,-300 misappropriated from the Trust's account because this breach was a violation of the written terms of the loan agreement. It relies on *Howell v. Continental Credit Corp.*, 655 F.2d 743 (7th Cir.1981), which held that the FDIC cannot invoke *D'Oench* "where the document the FDIC seeks to enforce is one ... which facially manifests bilateral obligations and serves as the basis of the [promisor's] defense." *Id.* at 746 (emphasis omitted). Seizing on the language of *Howell*, the Trust advances much the same argument with respect to the breach of contract claim as asserted in its challenge to *D'Oench*'s application to its tort claims, i.e., that the "bilateral obligations" of the loan agreement, and not the secret kickback agreement, are the basis for its breach of contract claim. Once again, the Trust's argument ignores the opinion of the bankruptcy court, which expressly stated that the $26,300 judgment for the Trust on the breach of contract claim was founded on the kickback arrangement. *See* Bankruptcy Court Opinion, 119 B.R. at 375.

The Trust's reliance on *Howell* is also misplaced. The Trust's breach of contract claim required proof of the existence of a secret kickback arrangement. *Howell*, on the other hand, involved the FDIC's attempted enforcement of a lease that expressly imposed bilateral obligations on both the lessor and lessee. *See Howell*, 655 F.2d at 747. The Seventh Circuit ruled that the FDIC, as successor to the lessor, could not assert *D'Oench* to bar the lessee's contract defenses. *Id.* In *Howell*, the lessee's contract defenses were not premised on any secret agreement, but were based on the failure of the original lessor to fulfill the express conditions of the lease. *Id.* The limited exception to the *D'Oench* doctrine crafted by *Howell* does not apply to the Trust's breach of contract claim.[9]

**B. Fraud In The Factum**

■ The Trust further claims that two other recognized exceptions to the *D'Oench* doctrine apply to this case. The first exception is fraud in the factum. The Supreme Court's decision in *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), while addressed to the issue of the FDIC's right to invoke *D'Oench*'s statutory counterpart, 12 U.S.C. § 1823(e), is also applicable to analysis of fraud in the factum as a bar to the application of *D'Oench*. In *Langley*, the Court distinguished between the real defense of fraud in the factum, which renders a loan agreement entirely void and takes the agreement out of § 1823(e), and a defense of fraud in the inducement, which renders the loan agreement voidable but does not preclude the FDIC's assertion of § 1823(e). *Langley*, 484 U.S. at 93–94, 108 S.Ct. at 402. After reviewing the claim by the note makers that their participation in a land transaction had been procured by misrepresentations as to the size and character of the property involved, the Court concluded that the note makers' argument was a claim of fraud in the inducement. Accordingly, the Court found that the FDIC could properly invoke § 1823(e) to bar the assertion by the note makers of their fraud defense. *Id.* at 94, 108 S.Ct. at 403.

We think that the *Langley* Court's distinction for purposes of § 1823(e) between fraud in the inducement and fraud in the factum applies with equal force in the context of *D'Oench*. We have characterized fraud in the factum as a real defense that may be asserted when the original lender fraudulently procures the borrower's signature to an instrument without that borrower's knowledge of its true nature or contents. *See FDIC v. Caporale*, 931 F.2d 1, 2 n. 1 (1st Cir.1991) (noting that in the case of fraud in the factum, "the instruments would be void rather than voidable, leaving no title capable of transfer to the FDIC."). *See also* E. Allan Farnsworth, *Contracts* § 4.10 (1982) (describing fraud in the fac-

---

**9.** Since *Howell,* the Seventh Circuit has cautioned note makers from the over-hasty invocation against the FDIC of the exception to *D'Oench* contemplated by that decision: "Lesson Number One in the study of law is that general language in an opinion must not be ripped from its context to make a rule far broader than the factual circumstances which called forth the language." *FDIC v. O'Neil*, 809 F.2d 350, 354 (7th Cir.1987).

tum as arising in the rare situation in which the defrauded party "neither knows nor has reason to know of the character of the proposed agreement. . . .").

The Trust analogizes its situation to that of the defendant in *FDIC v. Turner*, 869 F.2d 270 (6th Cir.1989). There, the defendant signed a blank guaranty form to which the name of the debtor and the amount of the guaranty were later added. In addition, the name of the lending bank on the original guaranty was subsequently obliterated with correction fluid and substituted with that of another bank. *Id.* at 272. When the FDIC sued to enforce this altered version of the loan guaranty, the defendant raised the defense of fraud in the factum. The Sixth Circuit agreed that the defendant was defrauded as to the guaranty's essential terms, and held that the FDIC was therefore precluded from interposing *D'Oench* to bar the defense. *Id.* at 275–76.

Review of these cases convinces us that the Trust's claim was one of fraud in the inducement, and not of fraud in the factum. The bankruptcy court found that the Bank, acting under Weiner's supervision, falsely represented to the Trust that the consideration for the first loan was limited to the consideration itemized in the original agreement.[10] The Bank's misrepresentation did not go to the very character of the proposed loan agreement, but only to its underlying terms. Unlike the note maker in *Turner*, the Trust cannot claim that when it executed the promissory note to the Bank, it was "unaware of the nature of the documents [it] signed." *Caporale*, 931 F.2d at 2, n. 1. The Bank, through Weiner, induced the Trust to execute the loan agreement by misrepresenting the consideration involved. There was, however, no fraud in the factum precluding application of *D'Oench* because there is no evidence to suggest that the Trust did not fully understand the basic nature of the obligation it assumed by entering the loan agreement.

The Bank's extraction of additional $26,300 in consideration from the Trust did not fundamentally alter the nature of the instruments themselves.

## C. Innocence As A Defense to D'Oench

 The second exception to *D'Oench* claimed by the Trust is that it was completely innocent of any intentional or negligent deception. The Trust contends that it could not have "lent [itself] to a scheme or arrangement" which misled the FDIC because Benjamin negotiated and transferred the kickback payments to Weiner without the knowledge of the other beneficiaries of the Trust. The Trust maintains that the district court improperly concluded that the record established that the Trust involved itself in the kickback scheme. Emphasizing that the bankruptcy court found that *both* Benjamin and the Bank were liable on the conversion count, the Trust claims that Benjamin could not have been acting as its agent or for its benefit when he removed $26,300 in loan proceeds from the Trust's accounts to make kickback payments.

As authority for its claim of innocence as an exception to *D'Oench*, the Trust cites a footnote to *Vernon v. Resolution Trust Corp.*, 907 F.2d 1101, 1106 n. 4 (11th Cir. 1990), which in turn relies on an earlier decision of the Ninth Circuit, *FDIC v. Meo*, 505 F.2d 790 (9th Cir.1974). Yet in *Baumann*, the Eleventh Circuit expressly rejected *Vernon's* suggestion of the continued viability of a "complete innocence" exception: "it is clear that this exception is no longer tenable because lack of bad faith, recklessness, or even negligence is not a defense in *D'Oench* cases." 934 F.2d at 1516. *See also FSLIC v. Gordy*, 928 F.2d 1558, 1567 n. 14 (11th Cir.1991) (observing that innocence doctrine of *Meo*, in light of Supreme Court decision in *Langley*, "is based on an outdated understanding" of *D'Oench* ). *Baumann* emphasized that such an exception would be contrary to the broad purpose of *D'Oench* to prevent a

---

10. The bankruptcy court also found that the damages against the Bank for both the Trust's tort and contract claims were limited to the $26,300 in additional "consideration" extracted from the proceeds of the First Loan Agreement. It declined to declare the First Loan Agreement

unenforceable because of the illegal consideration, reasoning that to do so would "penaliz[e] the Bank in the full amount of the loan, an amount . . . grossly disproportionate to the amount converted."

private party from enforcing against the federal authority "any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the institution's records." *Baumann,* 934 F.2d at 1515.

In *Timberland,* this court also stressed the basic purpose of *D'Oench* to protect a federal receiver even "where the only element of fault on the part of the borrower was his or her failure to reduce the agreement to writing." 932 F.2d at 49 (citation omitted). We agree with the *Baumann* court that the borrower's state of mind is irrelevant, because the "proper focus under *D'Oench* is whether the agreement, at the time it was entered into, would tend to mislead the public authority." *Id.* at 50. Our earlier cases have never recognized the "complete innocence" exception to *D'Oench* alluded to by the Trust, and we reject the invitation to adopt it now as the law of this circuit.

 Our conclusion that there is no "complete innocence" exception to *D'Oench* is not entirely dispositive of the Trust's argument. As we understand it, the "innocence" professed by the Trust is not the kind of paradigmatic "complete innocence" formerly recognized as an exception to *D'Oench*—i.e., a borrower entering into an unrecorded side agreement innocent of any intentional or negligent deception. Rather, the Trust's claim of "innocence" is really an argument that the actions of Benjamin should not be attributed to the Trust and that the Trust did not actually lend itself to the kickback arrangement.

The factual record belies the assertion that Benjamin did not act on behalf of the Trust. The bankruptcy court found that it was Benjamin alone who negotiated the terms of the First Loan Agreement on behalf of Young and her associates. It was Benjamin who at the same time agreed to the kickback arrangement that secured Weiner's assistance in obtaining approval of the loan by the Executive Committee. At the closing of the First Loan Agreement—at which time the Trust was formally created—a signature card was executed authorizing Benjamin to withdraw funds from the Trust's loan proceeds account. The bankruptcy court further found that Benjamin was also given authority to access the Trust's funds in other accounts at the Bank, including one for the restaurant and another for rental income from the Columbus Avenue properties.

It seems clear that Benjamin acted with the ostensible authority of the Trust and its principals throughout the negotiation and execution of the First Loan Agreement. The Trust, therefore, cannot disclaim all of Benjamin's actions with respect to the kickback agreement. Indeed, the Trust is willing to concede that "one could argue that Benjamin was acting as an agent of the [Trust] when he entered into the kickback scheme with Weiner." Brief for Appellant 604 Columbus Avenue Realty Trust at 32. In these circumstances, the Trust "lent [itself] to a scheme or arrangement whereby the banking authority ... was or was likely to be misled." *D'Oench,* 315 U.S. at 460, 62 S.Ct. at 681.[11]

Because we find that the district court correctly applied the *D'Oench* doctrine to bar the Trust's claims and equitable subordination against the Bank based on the kickback agreement, we do not reach the FDIC's arguments under § 1823(e).

## III. THE FEDERAL HOLDER IN DUE COURSE DOCTRINE AS A BAR TO THE TRUST'S CLAIMS AND EQUITABLE SUBORDINATION AGAINST THE FDIC IN ITS RECEIVERSHIP CAPACITY

We turn next to the FDIC's principal argument on appeal: that the district court

---

11. Our ruling is consistent with the decision in *FDIC v. Kasal,* 913 F.2d 487 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991). In its reply brief, the Trust draws on language from a dissenting opinion in *Kasal* for the general proposition that "it is a perversion of justice to hold the borrowers responsible for funds misappropriated by a bank officer." *Id.* at 496 (Heaney, J., dissenting). In *Kasal,* the borrower was totally unaware of a misappropriation from his accounts by a bank officer. In this case, Benjamin, a representative of the Trust, both negotiated and carried out the misappropriations from the Trust's account.

erred when it held that the federal common law holder in due course doctrine did not bar the Trust's claims against the FDIC in its receivership capacity and the equitable subordination of the FDIC's secured interest in the Trust's bankruptcy estate. The FDIC addresses this argument to the bankruptcy court's judgment against the Bank for $111,711.66 on the Trust's conversion and breach of contract claims for misapplication of loan proceeds for payment of interest, taxes and other soft costs.[12] The FDIC has conceded in this case that *D'Oench* does not bar the Trust's claims based on breach of the soft costs provisions of the two loan agreements. Instead, the FDIC insists that policy concerns similar to those underlying the *D'Oench* doctrine militate in favor of expanding the federal holder in due course doctrine to the FDIC in its receivership capacity when, as here, there has been no purchase and assumption transaction by the FDIC in its corporate capacity.

### A. Origins of the Federal Holder in Due Course Doctrine

█ In order to evaluate the strength of the policy concerns that the FDIC asserts as the basis for extending the federal holder in due course doctrine to the FDIC in the circumstances of this case, we first examine this doctrine as it has emerged in cases involving purchase and assumption transactions by the FDIC in its corporate capacity.

The germinative opinion in the development of the federal holder in due course doctrine was *Gunter v. Hutcheson*, 674 F.2d 862 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). In *Gunter*, the FDIC in its corporate capacity acquired a promissory note after a purchase and assumption transaction involving

a failed Tennessee bank. The note makers brought suit for rescission of the note held by the FDIC on the basis of, *inter alia*, fraudulent misrepresentation by the directors of the failed bank. *Id.* at 866. The FDIC counterclaimed for payment of the note in the district court, asserting that § 1823(e) barred the note makers' claims, and arguing in the alternative that federal common law gave it a defense against claims of fraud of which it lacked knowledge. *Id.* at 866–67.

Although the *Gunter* court rejected the application of § 1823(e) to bar the note maker's fraud claims,[13] it accepted the FDIC's argument that a federal common law rule of nonliability against these claims was necessary in order for the FDIC to accomplish its statutory objectives. In reaching this conclusion, the *Gunter* court applied the Supreme Court's test for determining whether the implementation of a federal program would be frustrated without the adoption of a uniform federal rule. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). Applying *Kimbell Foods*, the *Gunter* court stressed the FDIC's duty to promote "the stability of and confidence in the nation's banking system," *id.* at 870, and the preferred status of the purchase and assumption transaction as a means of accomplishing this duty because "it avoids the specter of closed banks and the interruption of daily banking services." *Id.*

The court noted that speed was of the essence in a purchase and assumption transaction because of the need to preserve the going concern value of the bank:

> [T]he FDIC must have some method to evaluate its potential liability in a purchase and assumption versus its potential liability from a liquidation. Because of the time constraints involved, the only

---

12. The FDIC also argues that the federal holder in due course doctrine bars the Trust's fraud claim arising from the kickback agreement. Because we have already held that the Trust's claims based on the kickback agreement were barred by the *D'Oench* doctrine, we need not address this aspect of the FDIC's holder in due course argument.

13. The *Gunter* court found it necessary to reach the merits of the FDIC's federal common law argument because it found that the note maker's fraud defenses were not precluded by § 1823(e). *Gunter*, 674 F.2d at 867. This analysis of § 1823(e) as not barring a claim of fraud in the inducement was subsequently disapproved by the Supreme Court in *Langley*. *See Langley*, 484 U.S. at 93–94, 108 S.Ct. at 402.

method of evaluating potential loss open to the FDIC is relying on the books and records of the failed bank to estimate what assets would be returned by a purchasing bank and to estimate which of those assets ultimately would be collectible.

*Id.* After considering the impact of the federal rule on settled commercial expectations ordinarily governed by state law, the court concluded that protection of the FDIC from unknown fraud claims "far outweighed" any potential damage to these expectations. *Id.* at 872.

The court therefore announced a federal common law holder in due course rule applicable to the FDIC in its corporate capacity:

> [A]s a matter of federal common law, the FDIC has a complete defense to state and common law fraud claims on a note acquired by the FDIC in the execution of a purchase and assumption transaction, for value, in good faith, and without actual knowledge of the fraud at the time the FDIC entered into the purchase and assumption agreement.

*Id.* at 873. *Gunter* thus expanded federal common law to bar fraud claims by the note makers that would not otherwise have been barred by the *D'Oench* doctrine or § 1823(e). *See id.* at 872 & n. 14 (noting that *D'Oench* doctrine and § 1823(e) embody a "more limited" policy of protecting the FDIC).

This court has adopted the rule of *Gunter. See Southern Indus. Realty, Inc. v. Noe,* 814 F.2d 1 (1st Cir.1987) (per curiam). *See also FDIC v. Bracero & Rivera, Inc.,* 895 F.2d 824, 828–29 (1st Cir.1990) (dicta acknowledging holder in due course doctrine's availability to the FDIC in its corporate capacity). Other circuit courts have expanded the federal common law holder in due course doctrine to bar all personal defenses against the FDIC, and have looked to state law principles in order to distinguish between real and personal defenses. *See Campbell Leasing Inc. v. FDIC,* 901 F.2d 1244, 1249 (5th Cir.1990); *FDIC v. Wood,* 758 F.2d 156, 161 (6th Cir.) (the FDIC "takes the note free of all defenses that would not prevail against a holder in due course."), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985). *See also FDIC v. Bank of Boulder,* 911 F.2d 1466, 1474–75 (10th Cir.1990) (en banc) (adopting federal rule of transferability of letters of credit protecting FDIC in its corporate capacity during purchase and assumption), *cert. denied,* —— U.S. ——, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991). In all of these cases, the underlying rationale for a federal holder in due course rule has been consistent with that articulated by *Gunter:* to promote purchase and assumption transactions. *See Wood,* 758 F.2d at 160–61 (federal holder in due course rule necessary because "the essence of a purchase and assumption transaction is speed"); *Campbell Leasing,* 901 F.2d at 1248–1249 (same analysis); *Bank of Boulder,* 911 F.2d at 1474–75 (uniform rule of transferability necessary because of time constraints of purchase and assumption).

B. Application Of The Federal Holder in Due Course Doctrine To The FDIC As Receiver

 The FDIC argues that the federal holder in due course rule should be available to it in its capacity as the Bank's receiver. The FDIC insists that in order for it to decide whether a purchase and assumption or a liquidation is the least costly approach to disposing of the assets of a failed bank, it must be able to make that decision based on absolute reliance on the bank's records, unimpeded by personal defenses. The FDIC also asserts that if the federal holder in due course doctrine is limited exclusively to purchase and assumption transactions, it will be unable to employ a variety of newly-developed "hybrid" transactions for the resolution of bank failures that include elements drawn from both a liquidation and a purchase and assumption. Accordingly, the FDIC urges that we hold that the federal holder in due course doctrine applies to the FDIC in its receivership capacity, regardless of whether a purchase and assumption transaction is consummated.

To support its argument, the FDIC relies on several cases in which the FDIC in its

receivership capacity was allowed to invoke the federal holder in due course doctrine to bar the makers of promissory notes from asserting their personal defenses. But these cases involved notes acquired by the FDIC as receiver *after* a purchase and assumption transaction.[14] For example, in *Campbell Leasing*, the FDIC was appointed receiver of a failed Texas bank and arranged for a purchase and assumption transaction with a federally-established bridge bank, NCNB. 901 F.2d at 1247. During the purchase and assumption, NCNB acquired a promissory note that had previously been the subject of a lawsuit by the note maker against the failed bank. As receiver of the failed bank, the FDIC, along with NCNB, moved for summary judgment on the note maker's claims and on a counterclaim for enforcement of the note, arguing that the *D'Oench* and federal holder in due course doctrines barred all the note maker's claims and affirmative defenses. *Id.* The district court granted summary judgment for the FDIC and NCNB, and the Fifth Circuit affirmed the judgment on appeal. The court observed that it could find

> no logical reason to limit federal holder in due course protection to the FDIC in its corporate capacity, to the exclusion of its receivership function. In its corporate capacity, the FDIC is obligated to protect the depositors of a failed bank, while the FDIC as receiver must also protect the bank's creditors and shareholders. In both cases, the holder in due course doctrine enables the FDIC to efficiently fulfill its role, thus minimizing the harm to depositors, creditors, and shareholders.... We conclude that the

FDIC enjoys holder in due course status as a matter of federal common law whether it is acting in its corporate or receivership capacity.

*Id.* at 1249 (citations omitted).

The FDIC argues that because the protections of the federal holder in due course doctrine have been available to it in its receivership capacity in cases like *Campbell Leasing*, the logical next step is to apply the doctrine to the FDIC in its receivership capacity regardless of whether a purchase and assumption transaction has occurred. According to the FDIC, this extension of the federal holder in due course rule is necessary to enable it to decide properly whether a liquidation or purchase and assumption is the least costly means of dealing with the failed bank.

In its briefs in this appeal, however, the FDIC has neglected to mention the one decision that has directly addressed this argument. In *FDIC v. Laguarta*, 939 F.2d 1231 (5th Cir.1991), the FDIC argued that it was entitled to invoke the federal holder in due course doctrine to bar any defenses against enforcement of a promissory note acquired by it directly in its capacity as receiver. *Id.* at 1233–35. After observing that the FDIC's federal holder in due course argument had been raised in a "belated supplemental brief," the Fifth Circuit dismissed it peremptorily in a footnote:

> Here the FDIC sues only in its capacity as receiver for the institution which made the loan and is payee in the note sued on, and the FDIC does not assert, nor does the record establish, that the loan or note has ever been transferred or

---

**14.** The cases cited by the FDIC either involved the application of the federal holder in due course doctrine to assets acquired by the FDIC as receiver following a purchase and assumption transaction, or were not directly decided under the holder in due course rule. *See FDIC v. McCullough*, 911 F.2d 593 (11th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); *In re CTS Truss, Inc. v. FDIC*, 868 F.2d 146 (5th Cir.1989); *Firstsouth, F.A. v. Aqua Constr. Inc.*, 858 F.2d 441 (8th Cir.1988). In *McCullough*, the court observed that both the FDIC and FSLIC as receiver are "clothed under federal common law with the same defenses that would be accorded a holder

in due course under state law." 911 F.2d at 603. Yet in *McCullough*, the note on which the federal receiver was seeking to recover had earlier been acquired by the failed savings institution in a purchase and assumption transaction. *Id.* at 596. *CTS Truss* involved the enforcement by the FDIC as receiver of an asset acquired by it in its corporate capacity, 868 F.2d at 147, and was decided under § 1823(e) rather than the federal holder in due course doctrine. *Id.* at 150. As for *Firstsouth*, the federal common law rule at issue was the *D'Oench* doctrine, and not the more expansive holder in due course doctrine recognized by *Gunter*. *Firstsouth*, 858 F.2d at 443.

was ever part of a purchase and assumption transaction. To the extent that it precludes defenses beyond those precluded by *D'Oench, Duhme,* the federal holder in due course doctrine is inapplicable to such a situation. *Gunter....* See *Campbell Leasing....* Indeed, a major policy goal underlying the federal common-law holder in due course doctrine is to facilitate purchase and assumption transactions of failed financial institutions in lieu of liquidations. *Campbell Leasing; Gunter.*

*Id.* at 1239 n. 19 (citations partly omitted).

We likewise reject the FDIC's attempt to expand the federal holder in due course doctrine far beyond its original purpose of promoting purchase and assumption transactions that preserve the going concern value of the bank. None of the policy considerations that originally prompted the adoption of a federal holder in due course rule are present when, as in this case, the FDIC as receiver is seeking only to enforce an obligation in a liquidation. A liquidation does not further the federal policy of "bringing to depositors sound, effective, and uninterrupted operation of the [nation's] banking system with resulting safety and liquidity of bank deposits." *Campbell,* 901 F.2d at 1248 (quoting S.Rep. No. 1269, 81st Cong., 2d Sess., *reprinted in* 1950 U.S.C.C.A.N. 3765, 3765–66). Likewise, there is no need for speedy evaluation of the assets of a failed institution, and therefore little justification for adoption of a broad federal rule that would displace settled commercial expectations controlled by state law. *Cf. Gunter,* 674 F.2d at 872 (applying the *Kimbell Foods* test for adoption of federal common law rule). Furthermore, the FDIC does not rely as heavily on the books and records of the failed bank to

estimate its total loss in a liquidation as it must in a purchase and assumption.[15]

However desirable it may be for the FDIC in its receivership capacity to be able to bar counterclaims or affirmative defenses by the maker of a promissory note not already eliminated by *D'Oench* and § 1823(e), such a broad principle of federal common law cannot find its justification in the federal holder in due course doctrine currently applied by the courts. The district court's well-reasoned analysis of the FDIC's federal holder in due course argument aptly summarizes some of its deficiencies:

> The holder in due course doctrine normally allows innocent purchasers of negotiable instruments to rely on such instruments when they are acquired for value. The FDIC is granted this status so it can quickly scan a bank's balance sheet to negotiate its sale. Thus, the FDIC is not held up to an obligation to scrutinize the assets of a failed bank before it agrees to execute a purchase and assumption....
>
> The exigencies of a purchase and assumption transaction also differentiate the holder in due course doctrine from *D'Oench.* *D'Oench* is concerned with the integrity of a bank's records—the FDIC can only be charged for claims apparent from a search of the bank's files. The holder in due course doctrine, on the other hand, relieves the FDIC even from claims apparent on the face of the Bank's records.... The reach of the federal holder in due course doctrine being much wider than even the extraordinary remedy of *D'Oench,* the circumstances in which it is applied should be correspondingly limited.

---

**15.** This distinction between the cost estimate of a liquidation versus that in a purchase and assumption transaction was noted in *Gunter:* The maximum liability of the FDIC in a liquidation is fixed by the $100,000–per–depositor insurance limitation. In a purchase and assumption transaction, however, the FDIC agrees to repurchase any unacceptable assets from the purchasing bank and cannot rely on the statutory limitation of its liability. Hence to make the [cost test currently codified at 18 U.S.C. § 1823(c)(4)(A) ], the FDIC must have

some method of estimating its potential liability under a purchase and assumption to compare it to the maximum liability in a liquidation.

*Gunter,* 674 F.2d at 870 n. 10. This analysis belies the FDIC's assertion that if the federal holder in due course doctrine were limited solely to assets sold through a purchase and assumption, the federal receiver could not reliably estimate the cost of a liquidation as compared to that of a purchase and assumption.

The FDIC nonetheless insists that the unavailability of the federal holder in due course rule in the absence of a purchase and assumption would "immeasurably delay and complicate the resolution of receiverships" and create "delays and difficulties [that] could greatly impair the FDIC's ability to complete its statutory mission." In the same breath, however, the FDIC complains that the existing federal rule is problematic because it "substantively alters the receiver's evaluation of the alternative transactions in favor" of purchase and assumptions. The FDIC cannot have it both ways. The federal holder in due course doctrine was fashioned precisely for the purpose of expediting the purchase and assumption transaction. *See Gunter*, 674 F.2d at 869–71. It was never intended as a panacea intended to relieve the FDIC of all the "difficulties" arising from state law defenses and counterclaims during the liquidation of assets. We decline to address the FDIC's argument that a decision not to extend the federal holder in due course rule will impair its ability to conduct certain new "hybrid" transactions—i.e., transactions that involve elements of both a liquidation and a purchase and assumption—because this case does not involve such a "hybrid."

We therefore hold that the FDIC was not entitled to invoke the federal common law holder in due course doctrine to bar the Trust's claims of breach of contract and conversion as to the soft costs damages.[16]

IV. FEDERAL COMMON LAW AS A BAR TO EQUITABLE SUBORDINATION OF THE FDIC'S SECURED CLAIM AGAINST THE TRUST

▮ The FDIC next argues that to allow equitable subordination of part of its secured claim would be contrary to federal common law. The FDIC asserts that the availability of the equitable subordination remedy against it would frustrate federal policies intended to assist it in fulfilling its statutory duty to recover the maximum amount from bankrupt borrowers during the liquidation of assets of failed banks. The FDIC also insists that to allow equitable subordination against it would be inappropriate where the misconduct leading to the equitable subordination was that of the Bank and its officers, and not of the innocent federal receiver.

Section 510(c) of the Bankruptcy Code specifically authorizes a bankruptcy court to apply "principles of equitable subordination." [17] The judicially-developed case law of equitable subordination is of long standing. *See* 3 L. King, *Collier on Bankruptcy* ¶ 510.01 (15th ed. 1992) ("Collier"). The doctrine permits a bankruptcy court to rearrange the priorities of creditors' interests, and to place all or part of the wrongdoer's claim in an inferior status. The generally-recognized test for equitable subordination, adopted by this court, is set forth in *In re Mobile Steel Co.*, 563 F.2d 692, 703 (5th Cir.1977):

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Id.* at 699–700 (citations omitted). *See also In re Giorgio*, 862 F.2d 933, 938–39 (1st Cir.1988) (applying *Mobile Steel* test); 3 Collier at ¶ 510.05[2]. Before reaching the issue of whether this test was properly applied by the bankruptcy court, we first

---

**16.** Because the FDIC is not entitled to holder in due course status under the federal common law rule, we need not decide whether the Trust's soft costs claims would be barred by Massachusetts holder in due course law.

**17.** 11 U.S.C. § 510(c) provides:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

determine whether equitable subordination against a federal receiver should be prohibited as a matter of federal common law.

Only one decision in the federal courts of appeals has directly addressed the issue of equitable subordination against the FDIC. *See In re CTS Truss, Inc.*, 868 F.2d 146 (1989), *withdraw'g*, 859 F.2d 357 (5th Cir. 1988). In *CTS Truss*, the FDIC in its corporate capacity filed a proof of claim in bankruptcy court on certain notes and security documents made by the debtor. The debtor objected to the proof of claim, arguing that the FDIC's claim should be equitably subordinated to the claims of all the other creditors because the failed bank had engaged in wrongful conduct against the debtor prior to the FDIC's intervention as receiver. *Id.* at 147. The bankruptcy and district courts held that the FDIC's claims could not be subordinated because the "FDIC was a transferee innocent of any misconduct against CTS." *Id.*

The Fifth Circuit affirmed the bankruptcy court's decision, but on different grounds, holding that equitable subordination against the FDIC would have been improper for two distinct reasons. First, the court found that "[e]ven if the Bank's actions could be imputed to the FDIC, we do not believe that the unusual remedy of equitable subordination is appropriate to the facts alleged by the [debtor]." *Id.* at 148. Applying the *Mobile Steel* test, the court held that the debtor had failed to allege facts that demonstrated that the bank's conduct towards it would have justified the equitable subordination of a claim on the debtor's assets subsequently acquired by the FDIC. *Id.* at 148–49. The court disregarded the issue of the FDIC's "innocence" in assuming the assets of the failed bank, focussing instead on whether the failed bank's actions fit "within any of the classic patterns of conduct that have led the courts to fashion the extraordinary remedy of equitable subordination." *Id.* at 148.[18]

The other ground for the Fifth Circuit's holding in *CTS Truss* was the availability to the FDIC of § 1823(e)—and, implicitly, the *D'Oench* doctrine—to bar the debtor's claims. *Id.* at 149–50 & n. 8. The court thought it "likely" that the debtor had deliberately decided against raising its defenses to its indebtedness premised on the bank's conduct because it realized that the FDIC would be shielded from these claims. *Id.* at 149. It found that § 1823(e) "squarely" covered the debtor's claims against the Bank, and that the debtor would therefore have been unable to raise these claims against the FDIC. *Id.* at 150. The court concluded that "[e]ven if principles of equitable subordination otherwise permitted the imputation of wrongful conduct to a transferee such as the FDIC, we would be constrained to hold that [§ 1823(e) ] forbids that result." *Id.*

The Fifth Circuit's decision in *CTS Truss* establishes several principles that are useful to consideration of the FDIC's argument in this case. *CTS Truss* stands for the proposition that equitable subordination against the FDIC is barred when the claims on which the request for subordination is premised cannot be asserted against the FDIC because of federal law. On the other hand, *CTS Truss* does not entirely preclude the possibility of equitable subordination of an interest acquired by the FDIC because of the conduct of the failed bank. The Fifth Circuit declined to adopt the reasoning of the bankruptcy court below that the FDIC could not be equitably subordinated because it was "a transferee innocent of any misconduct" against the debtor. *Id.* at 147. Instead, the court focused on the issue of whether the conduct of the FDIC's predecessor in interest fit the "classic pattern[ ]" necessary for equitable subordination under the test in *Mobile Steel*. Because it found that the bank's conduct in relation to the debtor in *CTS Truss* did not fit that pattern, the

---

**18.** The court also noted that to the extent the debtor's claims of fraud and breach of an oral promise were "allegations [that] would justify disallowance or an offset against the Bank's secured claim, they would prevent the assertion of a claim of equitable subordination." *Id.* at 149 (citing *Mobile Steel* for the proposition that "claims should be subordinated only to the extent necessary to offset the harm done by the inequitable conduct").

Fifth Circuit never directly reached the issue of whether it would be appropriate to impute the actions of the bank to the FDIC for purposes of equitable subordination.

In this case, the FDIC asks that we adopt a rule of federal common law preventing the equitable subordination of the secured claim of a federal receiver as a result of misconduct by a failed bank. We reject this approach because we think that the analysis of the Fifth Circuit in *CTS Truss* demonstrates that such a broad rule of federal common law is unnecessary to protect a federal receiver.

As evidence of a federal policy to protect the value of assets acquired by the FDIC in its receivership capacity, the FDIC cites the developing federal common law embodied in the *D'Oench* and federal holder in due course doctrines. As an additional example of Congressional intent to protect it, the FDIC also points to the recent amendments in FIRREA extending the coverage of § 1823(e) to the FDIC as receiver.[19] Drawing on these examples, the FDIC urges that the adoption of a federal rule barring equitable subordination is a logical extension of this policy to protect it in its receivership capacity. Otherwise, the FDIC warns, the "absence of a federal rule barring equitable subordination of the receiver's claims against bankrupt borrowers will materially and adversely restrict the receiver's ability to resolve bank receiverships at the lowest cost to the public." Brief for Appellant FDIC As Receiver for Capitol Bank and Trust Company at 32.

The problem with this argument, as *CTS Truss* demonstrates, is that the adoption of a federal common law rule precluding equitable subordination would be superfluous in those cases in which the debtor's claims against the receiver were already barred under *D'Oench*, § 1823(e), or, if the asset was acquired by the receiver after a purchase and assumption, the federal holder in due course doctrine. Only if the debtor's request for equitable subordination were based on claims not already barred by the FDIC's federal defenses would a federal common law rule preventing equitable subordination be necessary to protect the value of assets acquired by the FDIC in its receivership capacity. The FDIC's suggestion that the absence of such a common law rule would "undercut the policy underlying the well-established federal common law *D'Oench, Duhme* and federal holder in due course doctrines" is plainly hyperbole. A rule precluding equitable subordination against the FDIC would in fact work a significant expansion of the protections already afforded it in its receivership capacity under *D'Oench* and § 1823(e). Claims or defenses that a borrower might otherwise properly assert against the federal receiver would be rendered meaningless if the borrower entered bankruptcy because equitable subordination would be unavailable even if the borrower prevailed on these claims or defenses.

The FDIC maintains that such a result would be consistent with the policy of enhancing the federal receiver's ability to resolve bank failures at the lowest cost to the public. Yet if the maximization of the FDIC's recovery on the assets of a failed bank was the sole objective of federal statutory and common law in this area, then *all* claims or defenses against the FDIC's recovery on assets would by now have been barred by federal statutes or common law. As our discussion of *D'Oench*, § 1823(e) and the federal holder in due course doctrine makes clear, while it is certainly true that federal law affords the FDIC broad protection against the claims and defenses of borrowers, that protection has never amounted to total immunity. *Cf. FDIC v. Jenkins*, 888 F.2d 1537, 1546 (11th Cir. 1989) ("Of course, it would be convenient to the FDIC to have an arsenal of priorities, presumptions and defenses to maximize recovery to the insurance fund, but this does not require that courts must grant all of these tools to the FDIC in its effort to

---

**19.** FIRREA amended § 1823(e) by extending its coverage to "any asset ... acquired by [the FDIC] ... either as security for a loan or by purchase *or as receiver of any insured depository institution....*" (Emphasis added). Before FIRREA, § 1823(e) applied only to the FDIC in its corporate capacity, and it was only through decisions applying the *D'Oench* doctrine that the FDIC as receiver was protected from unrecorded agreements. *See Timberland,* 932 F.2d at 49.

maximize deposit insurance fund recovery."). Nor are we convinced that the absence of a federal rule preventing equitable subordination would impair the operation of the FDIC as receiver to the same extent that, for example, the absence of a federal holder in due course doctrine would impair the FDIC's ability to conduct purchase and assumption transactions. *Cf. Gunter,* 674 F.2d at 870 (principal justification for federal common law rule was that its absence would "make the FDIC's task of executing its statutory mandate ... nearly impossible"). Maximization of the FDIC's recovery alone has never been an adequate justification for the adoption of a rule of federal common law.

■■■ The FDIC also argues that equitable subordination would never be appropriate when it was only the wrongful conduct of the failed bank and its officers, and not of the innocent federal receiver, that provided the bankruptcy court with the basis for subordination.[20] This argument raises the issue left undecided by *CTS Truss:* whether it would be appropriate to impute the misconduct of officials of a failed bank to the federal receiver for purposes of equitable subordination.

While the question is a close one, we think that any inequity that would result from imputing bank officials' misconduct to the federal receiver would be outweighed by adoption of a federal common law rule that would entirely prevent the debtor/borrower or its creditors from benefitting from the remedy of equitable subordination. The FDIC would not necessarily be the only "innocent" creditor affected by the adoption of such a rule. Many of the debtor/borrower's other "innocent" creditors would be deprived of any possibility of recovery from the estate in bankruptcy if equitable subordination was barred against the federal receiver. The FDIC should also be subjected to the constraints of equity.

*CTS Truss* prevents equitable subordination against a federal receiver based on claims or defenses of the debtor/borrower that are barred by the FDIC's established federal statutory and common law protections. The FDIC has not identified any additional policy considerations, beyond those already supporting its preexisting federal protections against borrowers' claims, that would favor the adoption of a new federal common law rule giving the federal receiver even greater protection in the event of the borrower's bankruptcy.[21] Accordingly, we find that there is no basis for totally exempting the FDIC in its receivership capacity from the remedy of equitable subordination permitted under the Bankruptcy Code.

We hold that equitable subordination may be sought against a federal receiver as long as this claim survives the test imposed by *CTS Truss.* The claim of equitable subordination is valid only if, (1) the claims or defenses on which the borrower's claim for subordination is premised are not already barred by the FDIC's recognized protections under federal law, and, (2) if the misconduct alleged in these claims or defenses against the receiver's predecessor in interest falls within "any of the classic patterns of conduct that have led courts to fashion the extraordinary remedy of equitable subordination." *CTS Truss,* 868 F.2d at 148.

---

**20.** The FDIC relies for this argument, *inter alia,* on the reasoning of the lower courts' decisions in *CTS Truss* that there would be "no basis for equitably adjusting the distribution of the bankrupt's assets because the *claimant* never engaged in misconduct." Brief for Appellant FDIC at 34 (citing district court decision in *CTS Truss*). As we have noted, the Fifth Circuit expressly declined to ground its decision on this rationale.

**21.** The FDIC maintains that in this case the statutory limitation on its liability as a receiver justifies the denial of equitable subordination. *See* 12 U.S.C. § 1821(i)(2). This fact-specific argument is not pertinent to our consideration of whether it is necessary to adopt a rule of federal common law barring equitable subordination against the federal receiver. We also note that we doubt that the diminution of the secured claim of the federal receiver resulting from equitable subordination would be a "liability" against the FDIC within the meaning of this provision. *Texas American Bancshares, Inc. v. Clarke,* 954 F.2d 329 (5th Cir.1992), a case involving the priority of payments by the FDIC to creditors of a failed bank after a purchase and assumption, is not material to the issue before us.

## V. THE BANKRUPTCY COURT'S JUDGMENT ON THE MERITS OF THE TRUST'S SOFT COSTS CLAIMS

The district court correctly determined that the federal holder in due course doctrine did not bar the Trust's conversion and breach of contract claims stemming from the misapplication of loan proceeds to soft costs payments. Having decided that equitable subordination is not barred as a matter of federal common law against a federal receiver, we must now consider the FDIC's challenge on the merits to the bankruptcy court's rulings in favor of the Trust on the breach of contract, conversion and equitable subordination claims relating to the soft costs overages.[22]

### A. Breach of Contract and Conversion

■ The FDIC challenges the district court's affirmance of the ruling of the bankruptcy court that the Bank breached the loan agreements by removing from the loan proceeds amounts that exceeded the agreed-upon limits for soft costs by $111,711.66. It contends that the provisions of the standard-form L & SA used for each loan agreement required the Trust to pay all expenses incurred by the Bank, and authorized the Bank to withdraw from any of the Trust's account any monies necessary to repay those expenditures. The FDIC places particular emphasis on sections 6.01 and 8.01 of the L & SA, which provide, *inter alia*, that "the Borrower agrees that any deposits or other sums ... may at all times be held and treated as collateral for any liabilities of the Borrower...."; that "the Borrower shall pay or reimburse the Bank on demand for all out-of-pocket expenses of every nature...."; and that "the Bank, if it chooses, may debit such expenses to the Borrower's Loan Account or charge any of the Borrower's funds on deposit with the Bank."[23]

The FDIC argues that both the district and bankruptcy court concluded erroneously that the allocations of soft costs provided in the addendum to the L & SA in each loan agreement prohibited the Bank from removing from the Trust's loan account additional amounts necessary to cover soft costs expenses once the original estimates were exceeded. It contends that both the Bank and the Trust knew that the soft costs allowances in both loan agreements—$100,000 in the First Loan Agreement and "approximately" $60,000 in the Second Loan Agreement—would be inadequate to pay all the soft costs expenses. According to the FDIC, by withdrawing payments for soft costs in excess of these amounts, the Bank was within its rights under the express terms of both L & SAs. More importantly, the FDIC argues, the Bank never intended to relinquish its rights under the L & SAs to complete recovery of unpaid expenses by limiting itself to the soft costs allowances included in the addenda to the L & SAs.

■ Following the lead of the parties and both courts below, we treat Massachusetts law as controlling in this case. This circuit has recognized that when interpreting contracts under Massachusetts law, "[i]n the search for plain meaning, a court should consider 'every phrase and clause ... [in light of] all the other phraseology contained in the instrument, which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties.'" *Boston Edison Co. v. FERC*, 856 F.2d 361 (1st Cir.1988) (quoting *J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789, 494 N.E.2d 374, 378 (1986)). The principles of interpretation applied by the Massachusetts courts conform to those of the leading commentators. Specific terms are given greater weight than general language. *See Lembo v. Waters*, 1 Mass.App. 227, 294 N.E.2d 566, 569 (1973) (" 'If the apparent inconsistency is between a clause that is general and broadly inclusive in character and one that is more limit-

---

**22.** The merits of the Trust's claims arising from the kickback arrangement are not at issue because the district court properly applied *D'Oench* to vacate that part of the bankruptcy's court's judgment and equitable subordination award in favor of the Trust that was premised on the kickback claims.

**23.** The FDIC also relies on several similar provisions of the construction loan agreements.

ed and specific in its coverage, the latter should generally be held to operate as a modification and pro tanto nullification of the former.'") (quoting 3 A. Corbin, *Contracts* § 547, at 176 (1960)). Separately negotiated or added terms are given greater weight than standardized terms or other terms not specifically negotiated. *See Carrigg v. Cordeiro*, 26 Mass.App. 611, 530 N.E.2d 809, 813 (1988) ("If ... there is conflict and inconsistency between a printed provision and one that was inserted by the parties especially for the contract that they are then making, the latter should prevail over the former.") (citations omitted).

Applying these principles to the Bank's conduct in this case, we conclude that the courts below were correct in holding that the Bank breached both loan agreements by withdrawing from the Trust's accounts payments for soft costs that exceeded the agreed-upon allocations. Although the provisions of the standard form L & SA used in both loan agreements gave the Bank broad authority to recover its out-of-pocket expenses, each L & SA was supplemented by an addendum prepared by the parties that specifically limited the amount of loan proceeds recoverable by the Bank as soft costs. The L & SA Addendum to the First Loan Agreement provided that only $100,000 of the loan proceeds were to be applied to soft costs and the remaining $200,000 in proceeds would be used for construction funding. The Bank's withdrawals of soft costs exceeded that $100,000 allocation by $2,305.54. The L & SA Addendum to the Second Loan Agreement provided that the Bank would "advance the loan proceeds approximately as follows: ... $60,000 for soft costs incurred with respect to the loan." The Bank's withdrawals of soft costs exceeded this "approximate" allocation by $109,406.12.

We reject the FDIC's arguments that the soft cost limits were merely estimates. The loan agreements clearly contemplated that while a portion of the loan proceeds would be used for the soft costs, the balance of the proceeds were to be applied by the Trust to the costs of the construction project that was the objective of the entire

transaction. A finding that the Bank breached these provisions does not, as the FDIC maintains, necessarily conflict with the bankruptcy court's determination that both parties understood that the $100,000 soft costs allocation in the First Loan Agreement would have to be supplemented by payments from the Trust's funds.

The FDIC correctly points out that when the Trust failed to cover the entirety of soft costs expenses incurred by the Bank, the Bank had the authority to recover these expenses from any of the Trust's accounts under the general provisions of the L & SAs used in each loan. Yet the means by which the Bank chose to exercise that authority—that is, by immediately recovering all its excess expenses directly from the loan proceeds otherwise earmarked for construction costs—countermanded the specifically-agreed upon allocation of loan proceeds between soft costs and construction costs. As the district court correctly noted, while the general provisions of the L & SAs and the construction loan agreements gave the Bank discretion to apply the Trust's *payments* on the loan as it saw fit, these provisions did not "give the Bank the untrammelled right to advance and apply loan proceeds willy-nilly." We therefore affirm the bankruptcy court's judgment for an amount equivalent to the total of the excess withdrawals made by the Bank towards soft costs payments for both loans—i.e., $2,305.54 for the First Loan Agreement and $109,406.12 for the Second, for a total of $111,711.66.

The FDIC also challenges the finding of the courts below that the Bank was also liable for conversion of the extra $111,711.66 removed from the loan proceeds for soft costs. Conversion consists of the wrongful exercise of dominion or control over the personal property of another. *See* 14A D. Simpson & H. Alperin, *Massachusetts Practice: Summary of the Law* § 1771 (1974). In order to recover for conversion, plaintiffs must show that at the time of the alleged conversion they had either actual possession or the right to immediate possession or control of the property in question. *Id. See also Me-*

*chanics Nat'l Bank of Worcester v. Killeen*, 377 Mass. 100, 384 N.E.2d 1231, 1240 (1979).

The FDIC argues that the Bank's withdrawal of excess soft costs payments did not constitute conversion because the Trust never had an immediate right to possession or control over the loan proceeds. It contends that the Trust failed to satisfy the conditions of the loan agreement that required the Trust, *inter alia*, to provide itemized requisitions of its construction expenses prior to the Bank's disbursement of any proceeds. Because of its failure to satisfy these conditions precedent, the FDIC reasons, the Trust never acquired a right to control or possession of any loan proceeds disbursed for construction purposes. Thus, the FDIC concludes, when the Bank disbursed loan proceeds for payment of construction costs and then applied these payments to soft costs payments, the Bank could not have converted those funds.

The problem with the FDIC's reasoning is that it misstates the factual circumstances of this case that explain *why* the Bank chose to disburse loan proceeds for construction. The FDIC ignores the finding by the bankruptcy court that Bank officers, under Weiner's orders, deliberately violated the conditions precedent of the First Loan Agreement in order to expedite the advancement of loan proceeds. *See* Bankruptcy Court Opinion, 119 B.R. at 360–61. The bankruptcy court also found that portions of those proceeds were then removed by Benjamin to make kickback payments to Weiner. As for the Second Loan Agreement, the bankruptcy court found that the conditions precedent for construction fund disbursement were in fact complied with by the Trust. *Id.* at 367. The record demonstrates that the Bank advanced monies to the Trust's loan account after the completion of construction work, only to apply these loan proceeds to the payments of soft costs.

We reject the FDIC's argument that the Trust had no right to possess and control

the proceeds of both loan agreements once they were deposited to the Trust's account. There is no basis in the record for the claim that violations by the Trust of the conditions precedent entitled the Bank to disburse funds for construction costs, begin to charge the Trust interest, and at the same time withdraw portions of these proceeds for soft costs payments. Both courts below correctly concluded that the Bank, by withdrawing amounts for soft costs beyond the agreed-upon limits of both loan agreements, thereby converted funds belonging to the Trust.

## B. *Equitable Subordination*

█ Because we have determined that the district court correctly found that the Trust's soft costs claims were not barred against the FDIC by federal law, we focus on the second element of the *CTS Truss* analysis: whether the misconduct of the Bank fit "within any of the classic patterns of conduct that have led the courts to fashion the extraordinary remedy of equitable subordination." *CTS Truss*, 868 F.2d at 148.[24]

The FDIC argues that even if the district court properly upheld the Trust's breach of contract and conversion claims, equitable subordination was nonetheless erroneous because the Trust failed to establish two of the elements of the *Mobile Steel* test: that the Bank's overapplication of loan proceeds to soft costs was misconduct sufficient to support an award of equitable subordination, or that this misconduct resulted in injury to the Trust's other creditors. *See Giorgio*, 862 F.2d at 938–39; *Mobile Steel*, 563 F.2d at 692. It also claims that to permit equitable subordination of its secured claim would result in a double recovery by the Trust.

Although the remedy of equitable subordination has been applied relatively infrequently, it is usually directed towards misconduct arising in three situations: when a fiduciary of the debtor misuses his position to the disadvantage of other creditors;

**24.** We disregard the FDIC's arguments that it is an "innocent" receiver, having rejected this line of reasoning in Part IV, *supra*.

when a third party dominates or controls the debtor to the disadvantage of others; or when a third party defrauds the other creditors. *Id.* at 148–49 (citing 3 Collier at ¶ 510.05). *See also* A. DeNatale and P. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors,* 40 Bus.Law. 417, 430–45 (1985) ("DeNatale & Abram"). This court has summarized briefly the purpose of the remedy:

> The case law does not suggest that the doctrine of equitable subordination gives the bankruptcy court a *general* license to weigh the moral quality of each debt or to compare creditors in terms of moral worth; rather it indicates that the bankruptcy court may equitably subordinate those debts, the creation of which was inequitable *vis-a-vis other creditors.* It permits a bankruptcy court to take account of misconduct of one creditor towards another, just as that court often can take account of a creditor's misconduct towards the *debtor* when considering whether to allow, or to disallow, a claim.

> Thus, most cases involving "equitable subordination" also involve corporate insiders or fiduciaries who have obtained unfair advantages over other creditors through, for example, fraud. Where a bankruptcy court has subordinated the debt of a creditor who was not an insider, it has done so on the ground that that conduct was egregious and severely unfair in relation to other creditors.

*Giorgio,* 862 F.2d at 939 (citations omitted and emphasis in original).

Whether the creditor is an insider or fiduciary of the debtor is fundamentally important to the level of scrutiny that courts apply to allegations of misconduct against a creditor. *See In re Fabricators, Inc.,* 926 F.2d 1458, 1465 (5th Cir.1991). *See also* DeNatale & Abram at 424 ("The creditor's duty of fair dealing is increased in the precise degree that the creditor has power and control over the debtor's affairs."). Claims arising from dealings between a debtor and an insider are rigorously scrutinized by the courts. *Fabricators,* 926 F.2d at 1465. On the other hand, if the claimant is not an insider, "then evidence of more egregious misconduct such as fraud, spoliation or overreaching is necessary." *Id.* (citing *In re N & D Properties, Inc.,* 799 F.2d 726 (11th Cir.1986)). *See also In re Friedman,* 126 B.R. 63, 71–72 (Bankr. 9th Cir.1991) (same principle).

Rather than decide the question of whether the Bank was a fiduciary or insider of the Trust, the bankruptcy court based its decision to award equitable subordination on its finding that the Bank's conduct was "illegal, egregious and severely unfair to other creditors" within the meaning of *Giorgio.* Bankruptcy Court Opinion, 119 B.R. at 377. The bankruptcy court's equitable subordination of the Bank was grounded on the Trust's claims of fraud, breach of contract and conversion claims relating to the kickback scheme *and* its claims of breach of contract and conversion premised on the soft costs overages. The court specifically cited the Bank's "fraud and illegality," which the bankruptcy court found "together constitute one of the three general categories of misconduct recognized by the courts as warranting equitable subordination." *Id.*

The district court upheld the equitable subordination against the FDIC's challenge on appeal, but at the same time vacated that portion of the original judgment that was based on the kickback claims, which it properly determined were barred by *D'Oench.* Accordingly, the district court removed from the judgment of equitable subordination the $26,300 in damages attributable to the kickback scheme. The district court otherwise affirmed in its entirety the bankruptcy court's determination that the Bank's misconduct justified equitable subordination with respect to the soft costs claims.

The FDIC argues that the Bank's misconduct in relation to the breach of contract and conversion claims was insufficient to support equitable subordination. This argument raises an issue that was not fully addressed by the district court when it reviewed the Trust's equitable subordination claim against the FDIC as the succes-

sor to the Bank: whether the bar under *D'Oench* to the Trust's kickback claims, and in particular its fraud claim, affected the validity of the bankruptcy court's original judgment of equitable subordination.

The bankruptcy court specifically premised the equitable subordination on the Bank's "fraud and illegality," and the Trust has never argued in this case that the Bank was an insider or fiduciary of the Trust. Nor has the Trust ever asserted that the Bank dominated or controlled its affairs.[25] Accordingly, the issue is whether equitable subordination can be based solely on the Bank's misconduct in relation to the excess withdrawals of soft costs.

 Courts have struggled to define precisely the misconduct necessary to support equitable subordination against a creditor who is not an insider. Fraud or misrepresentation are the most frequent justifications for equitable subordination of the noninsider.[26] They are not, however, required:

> Something less than actual fraud ... will suffice. The fixing of the lower limit is the elusive boundary which cannot be clearly defined. Although the courts have used general terms such as injus-

tice or unfairness to fix this lower limit, the minimum level of offending conduct appears to be conduct that shocks the conscience of the court....

DeNatale & Abram at 423–24. Types of misconduct sufficient to warrant equitable subordination against non-insiders have included instances of "[v]ery substantial misconduct involving moral turpitude or some breach or some misrepresentation where other creditors were deceived to their damage ... or gross misconduct amounting to overreaching...." *In re Mayo,* 112 B.R. 607, 650 (Bankr.D.Vt.1990) (citations omitted). For the most part, courts have been reluctant to find the requisite level of misconduct in arms-length dealings between borrowers and lenders.[27]

In *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351 (7th Cir.1990), the Seventh Circuit reversed the equitable subordination of a bank's priority claim to a borrower's estate. *Id.* at 1356–1359. The bankruptcy court had justified the equitable subordination on the basis of, *inter alia,* the hardship caused to the borrower/debtor by the bank's suspension of a new line of credit.[28] Finding that the bank

---

**25.** We add that such allegations, if made in this case, would not have been sufficient to satisfy the rigorous standard necessary to prove control or domination of the Trust's affairs by the Bank. *See, e.g., In re Burner,* 109 B.R. 216, 228 (Bankr.W.D.Texas 1989) ("A non-insider creditor will be held to a fiduciary standard only where his ability to control the debtor is so overwhelming that there has been a merger of identities."); *In re Beverages Int'l Ltd.,* 50 B.R. 273, 282 (Bankr.D.Mass.1985) ("[m]ore than mere pressure or influence on a debtor must be shown"). We also note that "[a]s a general rule lenders are not fiduciaries when it comes to collection on their claims." *In re Kelton Motors, Inc.,* 121 B.R. 166, 191 (Bankr.D.Vt.1990) (citing *In re W.T. Grant Co.,* 699 F.2d 599, 609 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983)).

**26.** *See, e.g., In re Bowman Hardware & Elec. Co.,* 67 F.2d 792, 795 (7th Cir.1933) (where creditor participated with debtor in scheme to misrepresent debtor's financial state, creditor's claim subordinated to that of other creditor injured by that misrepresentation); *In re Osborne,* 42 B.R. 988, 1000 (W.D.Wis.1984) (equitable subordination appropriate against lender based on its misrepresentations to another

creditor about that creditor's prospects for payment); *In re Slefco,* 107 B.R. 628, 644 (Bankr.D.Minn.1989) (equitable subordination of bank's claim predicated on bank's misrepresentation of amounts it intended to loan debtor).

**27.** *See In re Pacific Express, Inc.,* 69 B.R. 112, 117–18 (Bankr. 9th Cir.1986) (creditors' loan agreement with debtor, which effectively shifted risk of loss to other creditors, was not "the type of overreaching, fraud or other conduct which would justify subordination of a non-insider's claim"); *In re Dry Wall Supply, Inc.,* 111 B.R. 933, 937–39 (D.Colo.1990) (rejecting equitable subordination based on allegations that creditor knew that loan transaction would render borrower insolvent); *In re Pinetree Partners, Ltd.,* 87 B.R. 481, 490 (Bankr.N.D.Ohio 1988) (lender's refusal to provide additional credit and threatened foreclosure of debtor's mortgage not sufficiently egregious to warrant equitable subordination).

**28.** The other basis for the district court's equitable subordination was its finding that the bank had induced the borrower's suppliers to draw on letters of credit issued prior to the bank's provision of the new line of credit. *Id.* at 1354.

was not an insider or fiduciary of the borrower, and that the suspension of the borrower's line of credit was permitted under the loan contract, the Seventh Circuit rejected the reasoning of the bankruptcy court. *Id.* at 1356–58. During the course of its opinion, the court stated:

> [W]e are not willing to embrace a rule that requires participants in commercial transactions not only to keep their contracts but also do "more"—just how much more resting in the discretion of a bankruptcy judge assessing the situation years later.... Unless pacts are enforced according to their terms, the institution of contract, with all the advantages private negotiation and agreement brings, is jeopardized.
>
> "Inequitable conduct" in commercial life means breach *plus* some advantage-taking, such as the star who agrees to act in a motion picture and then, after $20 million has been spent, sulks in his dressing room until the contract has been renegotiated. Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of "good faith."

*Id.* at 1356–57 (citations omitted). The Seventh Circuit also rebutted the debtor's arguments that equitable subordination could be based on a breach of contract arising from the bank's failure to provide it telephonic as well as written notice of the suspension of the line of credit, noting that "[e]quitable subordination ... is not a device to magnify the damages available for inconsequential breaches of contract." *Id.* at 1359.

Applying the somewhat amorphous case law standards for equitable subordination to the facts of this case, we find that the Bank's excess withdrawals of soft costs was conduct sufficiently egregious to justify equitable subordination. The Bank's actions could fairly be characterized as "gross misconduct amounting to overreaching." *Mayo,* 112 B.R. at 650. Unlike the insubstantial breach of contract alleged in *Kham & Nate's Shoes,* the Bank's withdrawal of over $100,000 in excess of the agreed-upon soft costs limits was a sub-

stantial breach of the loan agreements. Moreover, the fact that the Bank advanced and withdrew loan proceeds arbitrarily, and at the same time caused interest to run on misappropriated proceeds, in our view rises to the level of "advantage-taking" within the meaning of *Kham & Nate's Shoes.*

As the bankruptcy court also found, the conversion of the soft costs monies handicapped the renovation effort and resulted in the Bank's recovering for its own benefit funds that the Trust had bargained with the Bank to set aside for construction creditors. Bankruptcy Court Opinion, 119 B.R. at 377. While the Bank was entitled to enforce the loan agreements without regard to the hardship imposed on the Trust, *Kham & Nate's Shoes,* 908 F.2d at 1357, those loan agreements did not authorize the Bank to seek reimbursement for unpaid soft costs from the Trust's construction funds. In this case, the hardship imposed on the Trust and its construction creditors flowed from the Bank's improper and unauthorized administration of the loans, and could therefore properly have been considered an element of the equitable subordination inquiry. We conclude that the Bank's misconduct in relation to the soft costs claims was sufficient evidence of misconduct on which to predicate the equitable subordination of the FDIC's secured claim.

The FDIC nonetheless argues that equitable subordination would be not appropriate under the second prong of *Mobile Steel* because the Bank's misconduct did not result in injury to the Trust's other creditors. The FDIC bases this argument on the bankruptcy court's determination that the misappropriation of loan proceeds by the Bank was not the principal cause of the failure of the Trust's construction project and failure to repay the loan. The FDIC maintains that the bankruptcy would have resulted even if the misapplication of loan proceeds had not occurred, and that any harm to the Trust's other creditors thus cannot be attributed to the Bank's conduct.

The FDIC's argument boils down to the assertion that equitable subordina-

tion is inappropriate unless the misconduct at issue is a major cause of the debtor's bankruptcy. This argument is without support in the case law. The second prong of *Mobile Steel* establishes only that equitable subordination is appropriate when the misconduct results in actual harm to the debtor or the other creditors, "or conferred an unfair advantage on the claimant":

> In examining the effect of the conduct on creditors, the court should consider the effect on the then-known creditors, as well as future creditors. In this analysis, the question to be answered is whether or not the offending conduct had an impact on the bankruptcy results, that is, the bottom line, in the proceeding before the court.... This would encompass all the effects of fraud and inequitable conduct that would have an impact upon [other creditors' legal or equitable rights in the bankruptcy results]....
>
> In demonstrating the harm, the objecting party usually need not identify specifically each particular creditor who was harmed and quantify the injury suffered by each. If the misconduct results in harm to the entire creditor body, the objecting party need demonstrate only that the misconduct harmed the creditor body in some general, albeit concrete, manner.

DeNatale & Abram at 426 (footnotes omitted). The bankruptcy court found, *inter alia,* that the Bank's misconduct damaged other creditors by depleting the Trust's assets and, consequently, its bankruptcy estate, and by substantially handicapping the renovation effort, on which many creditors ultimately had to rely for compensation. Bankruptcy Court Opinion, 119 B.R. at 377. We find that this depletion of the funds available for construction, and its attendant impact on the success of the Trust's renovation efforts, was a sufficiently concrete harm to the Trust's other creditors to warrant equitable subordination of the Bank. *Cf. In re Beverages Int'l Ltd.,* 50 B.R. 273, 283 (Bankr.D.Mass.1985) ("the misconduct may result in harm to the entire creditor body, [or] a particular class of creditors") (citing DeNatale & Abram).

There is no merit to the FDIC's argument that the Bank's conduct did not reduce the money present in the bankruptcy estate available to the other creditors. The FDIC points out that the Bank's overages of soft costs payments merely reduced the overall amounts due the Bank (and FDIC) as the Trust's principal secured creditor. It reasons that there could be no harm to the Trust's other creditors because the FDIC's secured claim exceeds the value of the Trust's assets. Such an argument ignores the very nature of the equitable subordination remedy, whose precise purpose is to permit recovery by other creditors with lower priority claims because of misconduct of a particular creditor whose claim would otherwise enjoy priority.

We also reject the FDIC's assertion that equitable subordination of its secured claim would grant the Trust a windfall double recovery. It is clear that it is the Trust's unsecured creditors who will benefit from the partial subordination of the FDIC's claim, not the Trust. The FDIC's contention that damages are an adequate remedy at law is equally spurious. The FDIC asserts that its secured claim far exceeds the value of the Trust's estate or its properties. Payment of damages by the FDIC on the soft costs claim, rather than equitable subordination of an equivalent amount, would simply increase the value of the estate that the FDIC would recover. Without equitable subordination, the FDIC would recoup from the Trust's estate any damages attributable to the Bank's misconduct. Equitable subordination is necessary in order to permit recovery by the Trust's other creditors to reflect the injury caused by the Bank's misappropriation of loan proceeds for soft costs.

Accordingly, we affirm the equitable subordination of the FDIC's secured claim, as reduced by the district court to an amount equivalent to the damages attributable to the excess soft costs monies withdrawn by the Bank.

## VI. INTEREST

The FDIC next attacks the inclusion of interest on the soft costs overages as part of the total amount of its secured claim subject to equitable subordination. It contends that the district court's affirmance of the bankruptcy's court award of post-judgment interest "at the contract rate from the dates on which they were misappropriated" was contrary to law. The FDIC argues that: (1) federal law forbids a post-judgment award of interest to the extent that it provides for interest after appointment of a receiver; and (2) the district court erred by setting post-judgment interest at the rate found in the Loan Agreements.

■■■ Because the FDIC did not raise its first argument in the district court below, we will not consider it. The district court's opinion makes no mention of the federal law bar to post-judgment interest claimed by the FDIC. The Trust asserts in its brief that the issue was never raised in the district court, and the FDIC has not refuted this contention in its reply brief. There is also nothing in the record before us that indicates that the issue was raised below. We, therefore, deem the argument waived. *See Boston Celtics*, 908 F.2d at 1045.

■■■ The FDIC relies for its second argument on section 6C of chapter 231 of the General Laws of Massachusetts, which provides in pertinent part:

> In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand.

Mass.Gen.Laws Ann. ch. 231, § 6C. The FDIC argues that this statute requires a twelve percent rate of interest on a judgment on a contract unless the contract obligated the judgment debtor—in this case the Bank—to pay interest at a different rate. The FDIC contends that because the Loan Agreements imposed no obligation on the Bank to pay any interest to the Trust,

Massachusetts' default judgment interest rate of twelve percent must be applied.

To our knowledge, the Massachusetts Supreme Judicial Court has never addressed the issue of whether rates of interest in a promissory note should be treated as the "contract rate" for purpose of post-judgment interest against the lender. *See Mechanics Nat'l Bank*, 384 N.E.2d at 1240 n. 14 (declining to address issue). After review of the bankruptcy court's interpretation of section 6C, we are persuaded that the court correctly decided to apply interest at the contract rate specified in the loan agreements:

> The contract rate is appropriate here ... because the Bank charged interest at the contract rate for the misappropriated proceeds. Some of the interest charged has been paid, and the remainder is part of the Bank's secured claim[ ]....

Bankruptcy Court Opinion, 119 B.R. at 371 n. 17. Application of the contract rate of interest was necessary in order to assure that the equitable subordination award fully reflected the damages to the Trust resulting from the Bank's excess withdrawal of soft costs. We affirm the district court's rejection of the FDIC's challenge on this issue.

## VII. ATTORNEY'S FEES

■■■ The district court affirmed equitable subordination against the FDIC's secured claim in an amount equivalent to the damages incurred by the Trust from the soft costs overages plus interest. It reversed, however, the bankruptcy court's determination that Massachusetts law permitted attorney's fees as an element of the damages for conversion. The district court held:

> The Bankruptcy Code permits equitable subordination of "all or part of an allowed claim to all or part of another allowed claim." 11 U.S.C. § 510(c)(1). As I have previously held that it was improper to award attorney's fees as an element of conversion damages, the attorney's fees can no longer be considered part of appellees' allowed claim against the estate. Thus, the plain language of

the statute precludes the subordination of the Bank's claim to the fee award. While the district court rejected subordination of attorney's fees on the grounds identified by the bankruptcy court, it also observed in a footnote that "[a]ttorney's fees [could] ... still be allowed, of course, as an administrative expense, *see* 11 U.S.C. § 503(b)(3), accorded the priority specified in the Bankruptcy Code."

The Trust challenges the district court's reversal of the bankruptcy court's inclusion of attorney's fees in the equitable subordination. The Trust does not, however, contest the district court's interpretation of Massachusetts conversion law. Rather, the Trust—or more precisely, the Trust's attorneys—argue that attorney's fees are a valid administrative expense claim against the bankruptcy estate within the meaning of 11 U.S.C. §§ 330(a)(1) and 503(b)(2).[29] The Trust's attorneys contend that because their fees are in fact a valid "claim" under these provisions, the bankruptcy court's decision to include attorney's fees in the equitable subordination against the Bank was proper. *See* 11 U.S.C. § 510(c)(1) (bankruptcy court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim....").

This argument puts the cart before the horse. Although both the bankruptcy and district courts acknowledged, in *dicta*, that a request by the Trust for attorney's fees might be an allowable administrative expense under the Bankruptcy Code, neither court expressly made such a determination. In fact, the Trust's attorneys acknowledge

in their reply brief that they have not, as yet, asked the bankruptcy court to award them attorney's fees as an administrative expense claim. *See* Reply Brief for Appellant 604 Columbus Avenue Realty Trust at 2–3. Any such award of attorney's fees as an administrative expense under sections 330(a)(1) and 503(b)(2) would require notice and a hearing. *See* 11 U.S.C. §§ 330(a) and 503(b).

In these circumstances, we need not address the argument that the bankruptcy court should properly have subordinated the Bank's secured claim to an administrative expense claim of the Trust's attorneys. Such a claim had neither been made nor allowed by the bankruptcy court at the time of its equitable subordination of the Bank. We, therefore, affirm the district court's reversal of the bankruptcy court's inclusion of attorney's fees in the equitable subordination against the Bank, insofar as that decision reversed the award of attorney's fees as an element of the conversion damages.[30]

## CONCLUSION

To summarize, we find that:

(1) the FDIC was entitled to raise its defenses under federal law for the first time on appeal in the district court;

(2) the *D'Oench* doctrine barred the Trust's claims for fraud, conversion, and breach of contract arising from the kickback scheme;

(3) the federal holder in due course doctrine did not apply to the FDIC in its receivership capacity in the absence of a purchase and assumption transaction,

---

**29.** Section 503(b) of the Bankruptcy Code governs the allowance of administrative expenses. Among the administrative expenses permitted, after notice and a hearing, are claims for "compensation and reimbursement awarded under section 330(a) of this title." 11 U.S.C. 503(b)(2). Section 330(a) provides in pertinent part:

(a) After notice to any parties in interest and to the United States trustee and a hearing ... the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such trustee,

examiner, professional person, or attorney, ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title....

11 U.S.C. § 330(a). Administrative expenses allowable under § 503(b), which include expenses under § 330(a), are given first priority of payment under the Bankruptcy Code. *See* 11 U.S.C. § 507(a)(1).

**30.** We express no opinion on the merits of the Trust's claim that its attorney's fees are administrative expenses within the meaning of sections 330(a)(1) and 503(b)(2).

and therefore did not bar the Trust's claims for conversion and breach of contract based on the soft costs overages;

(4) federal common law did not preclude equitable subordination against the FDIC in its receivership capacity;

(5) the bankruptcy and district courts properly found for the Trust on its breach of contract and conversion claims based on the soft costs overages;

(6) equitable subordination of the FDIC's secured claim in an amount equivalent to the soft costs damages was proper;

(7) the bankruptcy court properly included as part of the overall amount of the FDIC's claim subject to equitable subordination an award of post-judgment interest on the soft costs damages at the contract rate; and

(8) attorney's fees were not an element of conversion damages, and could not properly have been included in the amount equitably subordinated.

AFFIRMED.